**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. _____**

| | |
|---|---|
| **CARACOL TELEVISION, S.A.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **TELEMUNDO TELEVISION** | ) |
| **STUDIOS, LLC., TELEMUNDO** | ) |
| **INTERNACIONAL LLC, and** | ) |
| **TELEMUNDO NETWORK GROUP** | ) |
| **LLC,** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**<u>COMPLAINT</u>**

Plaintiff Caracol Television, S.A., ("Caracol"), by its undersigned attorney, for its

Complaint against the Defendants Telemundo Television Studios, LLC ("TTS"), Telemundo

Internacional LLC ("TI"), and Telemundo Network Group LLC ("TNG") (TTS, TI, and TNG,

collectively, "Telemundo Companies"), alleges as follows:

**I. The Nature of the Action**

1.      This action seeks declaratory relief regarding issues of copyright law, pursuant to

the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Copyright Laws of the United

States, 17 U.S.C. This action also asserts copyright infringement claims under Title 17, U.S.C.

Plaintiff additionally seeks monetary damages for breach of contract and an accounting.

**II. The Parties**

2.      Caracol was, at all times pertinent, and is, a sociedad anónima organized and

existing under the laws of Colombia, with its principal place of business in Bogota, Colombia.

3.      TTS was, at all times pertinent, and is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Miami, Florida.

4.      TI was, at all times pertinent, and is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Miami, Florida.

5.       TNG was, at all times pertinent, and is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Miami, Florida.

### III. Jurisdiction and Venue

6.      This Court has original subject matter jurisdiction over this action and the claims asserted herein, pursuant to 28 U.S.C. §§ 1331 and 1338(a), and supplemental jurisdiction over state law and common law claims pursuant to 28 U.S.C. § 1367.  This Court also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a company or citizen of a foreign state and citizens of the state of Florida and/or Delaware.

7.      TTS, TI, and TNG are subject to personal jurisdiction of the Court because each of them is a resident of this District, and TTS and TI have agreed to personal jurisdiction in the courts located in Miami-Dade County, Florida.

8.      Venue is proper in this judicial district, pursuant to 28 U.S.C. 1391(b)(l) and (2), because each of TTS, TI, and TNG conducts business in this district, a substantial part of the events giving rise to the claims occurred in this district and a substantial part of the property that is the subject matter of the action is situated within this district.

### IV. The Parties' Initial Agreements

9.      Caracol and the Telemundo Companies are in the business of the production, distribution and broadcast of television programs.

10.     On or about October 25, 2012, Caracol and TTS entered into a Co-Production Agreement, a copy of which is attached to this complaint as Exhibit A, by which the parties agreed to jointly develop, produce and distribute a Spanish-language telenovela titled "El Señor de los Cielos," referred to in the Co-Production Agreement as the "Series."

11.     On or about October 25, 2012, Caracol and TI entered into an International Distribution Agreement, a copy of which is attached to this complaint as Exhibit B, by which the parties agreed to certain exclusive exploitation and distribution rights as to the Series.

12.     The parties agreed that the copyright in the Series, in the script, and in derivative works was owned by Caracol and TTS jointly, subject to certain limitations upon the rights of each as a joint owner.

13.     In the International Distribution Agreement, in Clause 11.1, it is specified that the "intellectual property rights in and to the Series, their translations and adaptations, their title and all other elements of or appearing in the Series, or created pursuant to them are exclusively governed by the Co-Production Agreement."

14.     In the Co-Production Agreement, the parties agreed, in Clause 5(a), that "the Series and all elements thereof will be jointly and exclusively owned by the Parties [Caracol and TTS] throughout the world" subject to the agreed exclusive rights of each party to exploit the Series in certain territories. Clause 5(a) also provides that the parties' ownership of rights includes "the Series and all elements and portions thereof … including without limitation all literary, dramatic, or other material contained therein, all characters, concepts, properties, elements, names and titles contained therein."

15.     In the Co-Production Agreement, in Clause 5(c), the parties agreed that "the Parties [Caracol and TTS] will jointly and exclusively own the copyright and other intellectual

property rights in and to the Series, including all Ancillary Rights, in perpetuity throughout the world."

16.     In Clause 5(d) of the Co-Production Agreement, the parties agreed that "[t]he Parties [Caracol and TTS] will jointly and exclusively own the copyright and other intellectual property rights in and to the Original Script in perpetuity and throughout the world. No license, distribution or exploitation of any kind may be granted by either Party to third parties without the written approval of both Parties."

17.     Caracol and TTS agreed to limitations upon their rights as joint owners to make derivative works based upon the Series. Clause 5(b) of the Co-Production Agreement provides in part:

> In the event that either Party is interested in creating and/or producing or licensing a Remake, Spinoff, or Sequel based on the Series (each a "Derived Series"), such Party shall offer the other Party the option to become a co-producer in the creation, production, and exploitation of such Derived Series. … If the Party that receives the offer to co-produce the Derived Series rejects the offer in writing, then the Parties shall negotiate in good faith during the sixty (60) days following the notice of rejection the terms under which the interested Party may be granted the sole right to produce the Derived Series.

18.     Both the Co-Production Agreement, in Clause 10(d), and the International Distribution Agreement, in Clause 18.4, provide that claims and disputes relating to those agreements shall be resolved through binding arbitration in Miami-Dade County, Florida.

19.     The parties completed the production of the Series in accordance with the Co-Production Agreement and began distribution and exploitation pursuant to the terms of the Co-Production Agreement and the International Distribution Agreement. The original Series is a telenovela comprised of 74 episodes, which was first broadcast in 2013.

**V. The Parties' Agreement as to the Sequel.**

20.     Pursuant to the provisions of Clause 5(b) of the Co-Production Agreement, TTS

offered to Caracol the option to co-produce a sequel to the Series. On or about August 27, 2013,

Caracol and TTS entered into a letter agreement (the "Letter Agreement"), a copy of which is

attached to this complaint as Exhibit C. The Letter Agreement provided that TTS would produce

and distribute a sequel to the Series, subject to certain exhibition rights granted to Caracol.

Clause 3 of the "Term Sheet" attached to the Letter Agreement provides:

> a.      TTS will develop, produce, own, and distribute a sequel to the "El Senor
> de los Cielos" (the "Series") for the exhibition and exploitation in the United
> States, its territories, as well as throughout the world (the "Sequel").

> b.      The Sequel will be based upon the original format of the Series, which
> TTS shall have all right to use all elements (e.g., characters, story, scenarios,
> locales, etc.) derived from the Series and any new elements added by TTS for
> purposes of creating the Sequel. For clarity, TTS will not be entitled to use images
> and content licensed by Caracol for the Series, except as agreed mutually by the
> Parties in a case-by-case scenario.

Clause 7 of the Term Sheet provides:

> From inception through all stages of completion, the Sequel and all elements
> thereof, including the underlying works, format and scripts of the Series, will be
> exclusively owned by TTS throughout the world.

> TTS will own and control all exclusive, irrevocable and perpetual right, title and
> interest (including copyright), throughout the universe in and to the Sequel and all
> derivatives of the Sequel, and all elements underlying works or portions thereof,
> including raw footage, from the inception of production, in any and all media and
> formats now known or hereafter devised, in perpetuity, including without
> limitation all literary, dramatic and other material contained therein, and the
> results and proceeds of the services in connection therewith.

21.     In consideration of TTS's sole ownership of rights in the Sequel, Caracol was

granted a limited right to exhibit the Sequel in the country of Colombia, and a share of "Foreign

Net Sales" received by TI, documented by quarterly participation statements.

22.     The Letter Agreement provides that claims arising out of or relating to it "shall be litigated exclusively in the federal or state courts of Miami Dade, Florida."

23.     Upon information and belief, TTS produced the Sequel, a telenovela bearing the same title, "El Señor de los Cielos," comprised of 84 episodes, and commonly referred to as the second season, which was first broadcast in 2014. Upon information and belief, TI distributed the Sequel internationally, and licensed exhibitions of the Sequel worldwide.

### VI. Telemundo's Breaches

24.     In breach of the provisions of the Letter Agreement, TTS has failed and refused to provide complete and timely quarterly statements regarding Foreign Net Sales for the Sequel, and has failed and refused to pay to Caracol any sums due.

25.     Upon information and belief, TTS produced and exhibited a third season of "El Señor de los Cielos," comprised of 104 episodes and released in 2015, a fourth season comprised of 80 episodes and released in 2016, a fifth season comprised of 95 episodes released in 2017, and a sixth season released in 2018 and which is currently being broadcast (collectively the "Derived Series"). Upon information and belief, Telemundo produced and exhibited a spinoff series titled "El Chema" comprised of 84 episodes and released in late 2016 (the "Spinoff"). Upon information and belief, TI distributed the Derived Series and the Spinoff internationally, and licensed exhibitions of the Derived Series and the Spinoff worldwide.

26.     TTS breached the Co-Production Agreement by failing in each instance to offer Caracol the option to co-produce each of the Derived Series and the Spinoff, by failing to negotiate in good faith the terms under which TTS would enjoy the right to produce each of these works, by failing to negotiate in good faith the terms under which Caracol would gain exhibition and other exploitation rights to each of these works, and by failing to negotiate in

good faith the terms of Caracol's participation in revenues received from the exploitation of each of these works by TTS and TI.

27.     As a result, Caracol was required to purchase under the terms of volume license contracts rights to exhibit in Colombia the Derived Series and the Spinoff at the following costs:

El Señor Season 3 (104 episodes, $3,000 each)          $312,000

El Señor Season 4 (80 episodes, $4,624 each)          $369,920

El Señor Season 5 (95 episodes, $4,624 each)          $439,280

El Chema (84 episodes, $4,624 each)          $388,416

These costs to obtain exhibition rights are significantly higher than that which would have resulted from good faith negotiations under the terms of the Co-Production Agreement, resulting in damages to Caracol.

28.     Upon information and belief, TTS has granted to NBCUniversal, Inc., or other third parties a license, or an option to license, the format rights of the Series for the preparation of an English-language derivative work, but Telemundo has failed to obtain the approval of Caracol, in breach of the Co-Production Agreement, resulting in damages to Caracol.

29.     TTS seeks to justify its wrongful conduct by contorting the language of the Letter Agreement into a fictitious assignment of all of Caracol's share of the copyright in the Series. Specifically, TTS claims that the term of the Letter Agreement giving TTS exclusive ownership of the copyright in the Sequel implicitly conveys Caracol's copyright in the Series. Upon information and belief, it is the position of TTS and TI that, as a result of the alleged assignment of Caracol's rights, TTS and TI are freed from all responsibilities and limitations imposed by the Co-Production Agreement and the International Distribution Agreement.

30.     The position taken by TTS and TI is incorrect for several reasons.

A.      The Letter Agreement contains no express transfer of rights, and merely establishes the rights TTS enjoys in the Sequel. Pursuant to 17 U.S.C. § 204, a transfer of copyright requires a written instrument of conveyance signed by the owner of the copyright. The unambiguous terms of the Letter Agreement contain no words of conveyance as to the original Series.

B.      The bargain made by the parties and reflected in the Letter Agreement concerns the Sequel only.

C.      The plain language of the Letter Agreement reserves to TTS the ownership of the Sequel and its elements, including those elements that are adopted from the Series. To the extent the Sequel includes elements borrowed from the original Series, TTS owns the expression of those elements as they appear and are used in the Sequel. The right to use such elements in the Sequel does not convey ownership of the entire Series to TTS.

D.      The consideration provided in the Letter Agreement is wholly inadequate to support a purported transfer of Caracol's share of the copyright in the Series.

E.      The language of the Letter Agreement that makes a specific grant to TTS of the right to use elements from the Series in TTS's production of the Sequel, and to have the exclusive right to produce and exploit the Sequel, contradicts an intention to assign Caracol's share of ownership in the Series and its copyright. If such an assignment had been made, a grant of rights to make the Sequel would be unnecessary.

F.      The Letter Agreement was drafted by counsel for TTS and if there is any ambiguity in its language it must be construed against TTS. Further, counsel for TTS had every opportunity to include a statement of assignment of Caracol's rights in clear and unambiguous language if that was intended by the parties.

31.     While disputes and claims arising under the Co-Production Agreement and the International Distribution Agreement are subject to resolution by arbitration, as agreed by the parties, the falsely claimed assignment of Caracol's rights in the Series, and Caracol's claimed rights in the subsequent Derived Series and in the Spinoff are based upon the construction of terms of the Letter Agreement, and is therefore a matter reserved for litigation and decision by this Court.

32.     Telemundo's violations of Caracol's rights as an owner of a share of the copyright in the original Series, and Telemundo's breaches of contract have resulted in damages to Caracol well in excess of $75,000.

## COUNT I – DECLARATORY JUDGMENT AS TO COPYRIGHT

33.     Caracol incorporates by reference paragraphs 1 through 31 above, and re-alleges them here as though fully set forth herein.

34.     An actual controversy has arisen and now exists regarding the joint ownership of the copyright in the Series under U.S. Copyright Law. Caracol contends that it remains the joint owner, with TTS, of the copyright in the Series, while TTS contends that Caracol has assigned its interest to TTS.

35.     An actual controversy has arisen and now exists regarding the joint ownership of the copyright in the third, fourth, fifth, and sixth seasons, the Derived Series, of the telenovela, "El Señor de los Cielos," and the Spinoff "El Chema." Caracol contends that the Sequel, the Derived Series, and El Chema are derivative works of the original Series, and Caracol and TTS are therefore joint owners of the copyrights in the works that comprise the Derived Series and the Spinoff. Upon information and belief, TTS contends to the contrary that by the terms of the

Letter Agreement, Caracol assigned its copyright in the original Series to TTS, and that as a result TTS is the sole owner of all works derived from the original Series.

36.     A judicial declaration is necessary and appropriate at this time under the circumstances presented in order that the parties may ascertain their respective rights.

37.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and Rule 57, Federal Rules of Civil Procedure, Caracol is entitled to a judicial determination of the parties' respective rights under U.S. Copyright Law.

WHEREFORE, Plaintiff Caracol prays for a judicial declaration that an assignment of Caracol's copyright in the Series was not made, that Caracol remains a joint owner, with TTS, of the Series and the copyright in the Series, including the format rights and other rights as described in the parties' agreements, and that Caracol is a joint owner, with TTS, of the copyrights in the works derived from the Series, in particular, the works comprising the Derived Series, that is, the third, fourth, fifth, and sixth seasons of the telenovela, "El Señor de los Cielos," and the Spinoff, that is, the series "El Chema," and an award of costs of this suit.

## COUNT II – BREACH OF CONTRACT

38.     Caracol incorporates by reference paragraphs 1 through 32 above, and re-alleges them here as though fully set forth herein.

39.     The Letter Agreement did not transfer Caracol's interests in the Series and did not negate Caracol's rights under the Co-Production Agreement and the International Distribution Agreement. TTS has breached the Co-Production Agreement and TI has breached the International Distribution Agreement, and the breaches are material.

40.     Telemundo's breaches of contract caused Caracol to suffer damages exceeding $75,000, including but not limited to the loss of its share of revenues from the Derived Series, and from the Spinoff and from the licensing of format rights.

41.     Caracol's claims arising under the Co-Production Agreement and the International Distribution Agreement are agreed to be resolved through arbitration unless arbitration is waived.

WHEREFORE, Caracol demands judgment against TTS and TI for damages, both pre-judgment and post-judgment interest, and the costs of this suit. In the alternative, if arbitration of the claims asserted in this Count II is not waived, Caracol prays that the claims in this Count II be stayed pending resolution by arbitration, that litigation of the remaining Counts continue, and that arbitration of the claims asserted in Count II be stayed pending a final ruling on Count I of this Complaint.

## COUNT III – ACCOUNTING

42.     Caracol incorporates by reference paragraphs 1 through 32 above, and re-alleges them here as though fully set forth herein.

43.     In breach of the provisions of the Letter Agreement, TTS has failed and refused to provide complete and timely quarterly statements regarding Foreign Net Sales for the Sequel.

44.     In breach of the provisions of the Co-Production Agreement and the International Distribution Agreement, and in violation of Caracol's rights as a co-owner of copyrights, TTS and TI have failed and refused to provide accountings regarding revenues received from the exploitation of the Derived Series and the Spinoff and from any licenses or options regarding the format of the Series.

45.     The amount of money due from TTS and TI to Caracol is unknown to Caracol and cannot be ascertained without an accounting as to the Foreign Net Sales realized by TTS and TI from the exploitation of the Sequel, as to the revenues received by TTS and TI from the exploitation of the Derived Series and the Spinoff, and as to the granting by TTS of one or more licenses and options regarding the format of the Series. Upon information and belief, the amount due to Caracol exceeds $75,000, but TTS and TI have failed and refused to render such accountings or to pay sums due.

WHEREFORE, Caracol demands that TTS and TI be required to make an accounting, and that Caracol be awarded the costs of this suit.

## COUNT IV – COPYRIGHT INFRINGEMENT

46.     Caracol incorporates by reference paragraphs 1 through 23 and 25 above, and re-alleges them here as though fully set forth herein.

47.     Prior to the production and release of the Series, Caracol had produced and exhibited two seasons of a telenovela titled "El Cartel" and" El Cartel 2," each of which were first published in Colombia. Caracol owns the copyrights in "El Cartel" and "El Cartel 2," and pursuant to the U.S. Copyright Act, registration of Caracol's copyright claims with the U.S. Copyright Office is not a prerequisite to the filing of an action for infringement.

48.     The elements of "El Cartel" and "El Cartel 2," and in particular the episodes in which Caracol's copyright claims have been registered, include certain characters, story, and scenarios that were licensed by Caracol for use in the Series and in the Sequel.

49.     Upon information and belief, TTS has continued the use of certain elements of "El Cartel" and "El Cartel 2" in its productions and licensing of the Derived Series and in

commercial promotions, without seeking a license for such use and in violation of Caracol's copyrights. While the Letter Agreement permitted TTS to use all elements of the original Series in the Sequel, TTS did not obtain permission to use elements of "El Cartel" and "El Cartel 2" in the subsequent Derived Series or in commercial promotions.

50.     TTS has knowingly and intentionally infringed Caracol's copyrights in "El Cartel" and "El Cartel 2" by copying certain elements into the Derived Series and in commercial promotions and licensing the distribution and exhibition of the infringing Derived Series.

51.     Upon information and belief, TI and TNG have distributed, exhibited, and licensed the exhibition of the infringing Derived Series and commercial promotions, and have knowingly and intentionally infringed Caracol's copyright in "El Cartel" and "El Cartel 2."

52.     Upon information and belief, TTS intends to produce a seventh season of "El Senor de los Cielos" that will include elements of "El Cartel" and "El Cartel 2" without permission from Caracol.

53.     Upon information and belief, TTS intends to produce a spinoff series based upon a character featured in "El Cartel" and "El Cartel 2" without permission from Caracol.

54.     The wrongful acts of TTS, TI and TNG have caused and are causing great injury to Caracol, which damage cannot be accurately computed, and unless this Court restrains the Telemundo Companies from the further commission of these acts, Caracol will suffer irreparable injury, for all of which Caracol is without any adequate remedy at law.

WHEREFORE, Caracol demands:

(1) that the Telemundo Companies and all persons acting under their direction, control, permission or authority of each of the Telemundo Companies be preliminarily and permanently

enjoined and restrained from distributing, publicly exhibiting, and licensing the distribution and exhibition of the Derived Series;

(2) that TTS and all persons acting under its direction, control, permission or authority be preliminarily and permanently enjoined and restrained from producing works that infringe upon Caracol's copyrights in "El Cartel" and "El Cartel 2," from distributing such infringing works, and from licensing the distribution and exhibition of such infringing works;

(3) that for their infringing acts, judgment be entered against the Telemundo Companies, jointly and severally, for damages and the costs of this suit; and

(4) that this Court enter such other and further relief as may be just and equitable.


Dated: August 23, 2018.

Respectfully submitted,

**/s/David M. Rogero/**
**David M. Rogero, Esq.**
Florida Bar No. 212172
David M. Rogero P.A.
2625 Ponce de Leon Boulevard, Suite 280
Coral Gables, FL 33134
Telephone: 305-441-0200
E-mail: dmrogero@dmrpa.com;
yhayala@dmrpa.com

Attorney for Plaintiff Caracol Television, S.A.

Exhibit A

## CO-PRODUCTION AGREEMENT
**"El Señor de los Cielos"**

This Co-Production Agreement ("Agreement") is made as of October 25, 2012, and effective as of June 29, 2012, by and between Caracol Television S.A. ("Caracol") and Telemundo Television Studios, LLC ("TTS") with respect to the production of a telenovela tentatively entitled "El Señor de los Cielos" (the "Series"). This Agreement shall supersede all prior oral or written understandings and agreements between Caracol and TTS with respect to the matter hereto, including that certain Co-Production Services Agreement Term Sheet dated June 29, 2012. Caracol and TTS will each be referred to as "Party" and collectively as the "Parties".

1. **Conditions Precedent**:

The parties' obligations under this Agreement are conditioned upon and subject to: (a) the Parties' agreeing to a Budget for the Series, as set forth in Section 3.c. below; and (b) the execution of an International Distribution Agreement ("International Distribution Agreement") between Caracol and Telemundo Internacional, LLC ("TI"). If these conditions are not satisfied, the Agreement will terminate, and neither Party will have any further obligation to the other.

2. **Scope of the Agreement**:

The Parties will jointly develop, produce in High Definition, own, and distribute the Series. The Series will be a Spanish-language telenovela consisting of a minimum of sixty (60) episodes and up to seventy-five (75) one-hour episodes (approximately forty-two [42] minutes running time). The Series will be based on TTS's original script "El Señor de los Cielos" (the 'Original Script") which is owned by TTS. The Parties will share the territories for the foreign sales of the Series, as well as all revenues attributable thereto, in accordance with the International Distribution Agreement.

3. **Production/Budget/Approvals**:

    (a) The Parties will consult jointly in all business, financial and creative issues relating to the production and exploitation of the Series, including the Budget and key creative elements, including, scripts and storylines; the inclusion of sponsorship and/or product integration (except that the inclusion of stand-alone paid sponsorship and/or product integration shall be mutually agreed by the parties); the selection of the executive producer and other producers; director(s) director(s) of photography; head writer; program title; opening and closing titles (including, without limitation, the format for the credits); number of episodes; principal cast; main locations, artwork, and theme and incidental music (with world-wide all media synchronization rights or any other rights required to be cleared by TTS unless the parties otherwise agree). Notwithstanding the foregoing, TTS's will maintain final approval of each and every aspect of the Series, except for the following key elements which will be mutually agreed pursuant to the procedure in this paragraph by the Parties: (i) Executive Producer; (ii) Principal Lead Actor of the Series; and (iii) Principal Cast. TTS will send proposals requiring mutual agreement to Caracol in writing and Caracol shall respond within 3 business days from

the proposal by TTS and if Caracol does not agree with the proposal, TTS will send another proposal and the parties should mutually agree within 2 business days. If the parties are unable to resolve a dispute regarding the foregoing production approvals, TTS decision shall be final and controlling. For clarity, the Parties hereto have already agreed that Joshua Mintz will be the Executive Producer of the Series, and that Rafael Amaya will be the Principal Lead Actor of the Series. Moreover, the Parties mutually agree that if a Party requests that characters or materials be added to the Original Script and/or storyline of the Series (the "Additional Materials"), such Party shall bear the responsibility of clearing all necessary rights for the inclusion and use of such Additional Material in the Original Script, storyline, and/or Series at its request.

(b) All material business and creative decisions will be made by a four (4) person committee consisting of two (2) representatives appointed by Caracol and two (2) representatives appointed by TTS (the "Production Committee"). The representatives on the Production Committee will work in good faith to develop processes for timely exercising their approvals consistent with the production schedule for the Series (to be attached hereto when mutually agreed and as set forth in the Budget). All instructions, inquiries or other communications between the parties must be made in a timely manner.      All communications with TTS will be directed only to Joshua Mintz or Rudy Weissenberg. All communications with Caracol will be directed only to Felipe Boshell or Alejandro Toro.

(c) Each Party will pay fifty percent (50%) of the costs of producing the Series in monthly installments and in accordance with a cash flow schedule to be determined once the total budget has been created and agreed upon The Parties hereto mutually agree to a production budget of approximately One Hundred Forty Thousand Dollars (USD $140,000.00) per episode of the Series, with a maximum per episode ceiling of no more than One Hundred and Fifty Thousand Dollars (USD $150,000.00) ("Budget"). The Budget for the Series shall be prepared by TTS, but the Parties will jointly approve the Series' final Budget. The Budget will include: (i) the Development Costs (as defined in Section 3.c.i. below) and all direct and indirect costs and expenses associated with below-the-line and above-the-line production and/or delivery elements associated, directly or indirectly, with the Series, including but not limited to, all on-air talent, producers, and other production personnel, writers, scripts, directors, prompters, hand props, music synchronization and performance rights, technical crew, technical equipment, scenery, props, music performance rights, television studios facilities (collectively, "Production Costs"); (ii) any applicable production services fee for TTS, an affiliate of TTS or a third party not to exceed fifteen percent (15%) ("Studio Fee") of the net production Costs; (iii) the production and delivery schedule for the Series (to be attached hereto when mutually agreed); and (iv) a mutually-approved cash flow schedule on which the Parties will fund the Production Costs, and the Studio Fee, if any. Any Budget changes are subject to the mutual approval of the Parties, provided however, that any such changes do not unreasonably deteriorate TTS's production standards and quality of production.

(i)      The Budget will provide for the reimbursement to TTS of the actual costs incurred by TTS in developing the Series, which costs will be mutually agreed by



the Parties. The Development Costs will include any license fees, or scripts fee paid by TTS to the writer(s) of the Original Scripts.

(ii) If the Series utilizes the services of talent or other individuals who are under contract with a Party (for example, an actor under contract with TTS), such Party will be entitled to be reimbursed its direct, actual cost of providing such services (including salary and benefits, etc.), without mark-up. Any other costs in the Budget which represent payments for goods, services or materials will be at reasonable, fair market rates, without mark-up.

(iii) If the Parties mutually agree to extend the Series beyond the number of episodes contemplated in the Budget, they will mutually agree on an amendment to the Budget to provide for extra costs, production schedule and cash flow for such additional episodes.

(iv) Each party shall produce and borne the costs of producing its own promotional materials for the on-air promotional campaign of the  Series.  If the Parties mutually agree to create special material related to the Series for exploitation via the Internet, or other digital/new media (such as via cell phones or other portable devices, electronic sell-through, etc.) ("Digital Material"), the cost of producing the Digital Material will not be included in the Production Costs, and the Parties will mutually agree on a separate budget for the development and production of any Digital Material.

(v) Any pre-approved overage in Production Costs for the series will be borne equally by the Parties, and the Parties will equally share the benefit of any underage. Overages not preapproved in writing by Caracol are borne by TTS, unless these overages are the result of delays in approvals caused by Caracol not responding on a timely manner.

(vi)  TTS shall use commercially reasonable efforts to commence the production of the Series during the 1st quarter of 2013 ("Projected Start Date").

4. Deliverables and Technical Specifications

   (a) For the Series produced, TTS shall deliver to Caracol the materials specified in the Delivery Requirements and Technical Specifications to be attached hereto as Schedule B when mutually agreed by the parties.

   (b) Throughout the production period, TTS will deliver to Caracol:

      i. Costs Reports, Monthly costs reports fifteen (15) business days after the prior month's close and a final cost report within sixty (60) calendar days of completed production. Each cost report will include: (i) the current cost status; (ii) overages and underages and a brief explanation of why; (iii) changes from the last cost report; (iv) an estimated final cost, and (v) such other information reasonably required by Caracol; and



ii.   Production Reports. TTS shall deliver production reports to Caracol which shall include: i) total minutes filmed; (ii) total scenes filmed; (iii) number of episodes closed in production; (iv) number of episodes closed in post-production;(v)  number of episodes delivered; (vi) number of episodes to be delivered; (vii) a detailed description of any production issues; (viii) a detailed description of any script issues; and (ix) such other information reasonably required by Caracol. The Production Reports shall be delivered on a bi-weekly basis, within a reasonable time after the end of the corresponding production week(s).

iii.   TTS will keep full and complete records of all transactions for the Series for three (3) years after delivery of the last episode for the Series to Caracol. Caracol shall have the right, at its own cost, to audit and make copies of any such records at a reasonable time and place , and within thirty (30) days prior written notice.

5.  **Ownership; Copyright; Credits:**

(a) Ownership: From inception through all stages of completion, the Series and all elements thereof will be jointly and exclusively owned by the Parties throughout the world, except that TTS will have the exclusive exploitation, commercialization, and/or distribution rights of the Series in the United States (including its territories and possessions) ("TTS Territory") and Caracol will have the exclusive exploitation, commercialization and/or distribution rights of the Series in Colombia ("Caracol Territory").  The Parties will own and control all exclusive, irrevocable and perpetual right, title and interest (including copyright, as further defined below), throughout the universe  in and to the Series and all elements or portions thereof, including all raw footage, from the inception of production, in any and all media and formats, now known or hereafter devised, in perpetuity, including without limitation all literary, dramatic, or other material contained therein, all characters, concepts, properties, elements, names and titles contained therein and the results and proceeds of the services of all persons and entities rendering services in connection therewith, including the right, within the Parties' discretion, to exploit all ancillary and subsidiary rights in and to the Series, as further defined and restricted in the International Distribution Agreement.

 (b). Remake, Spinoff, Sequel Rights. In the event that either Party is interested in creating and/or producing or licensing a Remake, Spinoff, or Sequel based on the Series (each a "Derived Series"), such Party shall offer to the other Party the option to become a co-producer in the creation, production, and exploitation of such Derived Series. The commercial terms and conditions of such co-production shall be substantially similar to those agreed upon in this Agreement. If the Party that receives the offer to co-produce the Derived Series rejects the offer in writing, then the Parties shall negotiate in good faith during a period of sixty (60) days following the notice of rejection the terms under which the interested party may be granted the sole right to produce the Derived Series, Such terms shall include at a minimum: (a)  a license fee equal to fifty-percent (50%) of the market rate value of the re-make, spin-off, and/or sequel rights; and (b) a right of first



refusal to obtain the exhibition rights to the Derived Series in either Colombia or the United States (including its territories and possessions), as the case may be.

(c) Copyright of the Series: Except as otherwise set forth in Section 4.a. above, the Parties will jointly and exclusively own the copyright and other intellectual property rights in and to the Series, including all Ancillary Rights, in perpetuity throughout the world. "Ancillary Rights" means those allied and ancillary rights in and to the Series, including all merchandising, publishing, linear and non-linear programming, and all forms of internet, mobile, and home entertainment rights. The Parties will cooperate with each other and equally bear any costs relating to (i) the registration for copyright (or similar intellectual property right) protection in any territory where the Parties mutually deem such filings to be advisable; and (ii) the enforcement or protection of any such rights.

(d) Copyright of the Original Script. The Parties will jointly and exclusively own the copyright and other intellectual property rights in and to the Original Script in perpetuity and throughout the world. No license, distribution or exploitation of any kind may be granted by either Party to third parties without the written approval of both Parties.

(e) Credits: At the end of each episode of the Series, the following credit, or a similar agreed upon credit, will be included, followed by the logo and joint copyright of the Parties "Una co-producción de Telemundo Television Studios y Caracol Television S.A."

(f) Anti-Piracy: TTS will retain the right to prevent the unauthorized exploitation of of the Series worldwide. TTS will discuss and coordinate the effort to prevent such unauthorized use with Caracol,

6. **Exploitation of the Series:**

(a) Exploitation of the Series:

    i. TTS and/or its affiliates shall have the exclusive right to freely and fully exploit the Series (including the Ancillary Rights) in the TTS Territory in all media, in perpetuity. TTS shall also have the right to freely and fully exhibit the Series through any current or future Telemundo pay-TV channel in the territories that receive such channel, in perpetuity, only after Caracol has completed its initial broadcast channel exhibition of the Series in Colombia and subject to Section 6 (a) (iii) below

    ii. Caracol shall have the exclusive right to freely and fully exploit the Series (including the Ancillary Rights) in the Caracol Territory in all media, in perpetuity. Caracol shall also have the right to freely and fully exhibit the Series through any current or future Caracol pay-TV channel in the territories that receive such channel, in perpetuity, only after TTS has completed its initial broadcast channel exhibition of the Series in the



United States (its territories and possessions) and subject to Section 6 (a) (iii) below.

iii. Notwithstanding the foregoing in subsections (i) and (ii) above, the parties agree that the first window for the exploitation rights in pay TV platform in pan regional Latin America shall be carried out by a third party in accordance with the terms of the International Distribution Agreement. TTS and Caracol's right to freely exploit the Series through their respective pay-TV channels shall only become effective after the expiration of the exhibition window of such third party licensee.

iv. Caracol and TTS will have the right to distribute and exercise the Exploitation Rights (as such term will be defined in the International Distribution Agreement) to the Series (including the Ancillary Rights), in the Caracol Distribution Territories and Telemundo Distribution Territories; as such terms are defined in, and in accordance with the conditions of, the International Distribution Agreement. No later than thirty (30) days after commencement of the production of the Series, Caracol and TI will agree on: a) which party will be responsible for the exclusive distribution of the Series in a specific country or region, except that TI will be the exclusive distributor of the Series in Mexico; and b) the minimum gross price per episode of the Series to be applied to the sublicenses in each region or country included in the respective territories. After the termination of the International Distribution Agreement, the exploitation of any of the rights referred to in this Section may only be exploited upon the prior consent of the Parties.

7. **Representations and Warranties; Indemnity**:

(a) Each Party represents and warrants to the other that: (i) it has the full legal right, power, and authority to enter into and perform this Agreement; and (ii) it has not done and will not do any act or enter into any agreement, and is not party to any agreement, which would violate or might interfere with the performance of its obligations under this Agreement.

(b) TTS represents and warrants that TTS has obtained all rights, title and interest and control in and to the Series' underlying rights necessary for the Parties to fully exploit all rights and obligations hereunder, except that TTS makes no representation or warranty with respect to the clearance of the underlying rights necessary for the use of Additional Materials in the Original Script, storyline, and/or Series that have been added to such Original Script, storyline and/or Series at the request of Caracol TTS will indemnify and hold harmless Caracol, its corporate affiliates, and their respective officers, directors, agents, and employees from any and all claims, losses, actions or proceedings of any kind (including reasonable legal fees and costs) relating to or arising from the Series underlying rights, with the exception of claims related to or arising from the use by TTS



or Caracol of the Additional Materials included in the Original Script, storyline and/or Series at the request of Caracol, and provided however that TTS will not indemnify Caracol for any claim of lost profits.

(c) TTS represents and warrants that as of date hereof, there are not any liens, claims, encumbrances, legal proceedings, restrictions, agreements, arrangements or understandings which might conflict or interfere with, limit, derogate from, be inconsistent with or adversely affect any of the other parties rights hereunder and quiet enjoyment of the same by the other party and their respective licensees, successors and assigns.

(d) TTS represents and warrants that in the production of the Series, all laws, statutes, ordinances, rules and regulations applicable in the United States (and in all other locations where the Series is filmed or produced) have been, are being and shall be complied with in all material respects, as will all of the rules, regulations and requirements of any union, guild, and/or collective bargaining organization having jurisdiction thereof.

(e) Each Party will indemnify and hold the other Party, its parent, subsidiaries and related affiliates, and their respective officers, directors, agents, and employees harmless from any and all third party claims, actions or proceedings of any kind and from any and all damages, liabilities, costs and expenses, including reasonable legal fees and costs, (collectively, "Claims") relating to or arising out of: (i) any breach or alleged breach of any of the warranties, representations or agreements of the indemnifying Party; (ii) any error or omission in any of the material or information furnished to the indemnified Party in accordance with this Agreement; or (iii) the exercise by the indemnified Party of the rights granted to it hereunder. If the indemnified Party fails to promptly commence to do so after written notice from the indemnified Party and/or diligently pursue to a resolution that the indemnified Party reasonably deems necessary or desirable, the indemnified Party will have the right to adjust, settle, litigate and take any other action the indemnified Party deems reasonably necessary or desirable for the disposition thereof, as determined by the indemnified Party in its good faith business judgment. In any such event, the indemnifying Party will reimburse the indemnified Party on demand for all reasonable amounts paid or incurred by the indemnified Party as a result thereof.

7.  **Default/Termination**:

(a) Either Party may terminate this Agreement upon the commission of (i) a material breach of this Agreement by the other Party which is not capable of remedy or (ii) a material breach of this Agreement by the other Party which is capable of remedy, but which has not been remedied within a period of thirty (30) days after the non-breaching Party has delivered written notice to the breaching Party specifying the breach and requiring it to be remedied; provided, however, that such thirty (30) day period will be extended for such additional period as will be reasonably necessary if such breach is incapable of remedy

within thirty (30) days and during such period the breaching Party diligently endeavored to remedy the breach.

(b) Either Party will have the right, in addition to any other rights and remedies it may have, to terminate this Agreement if the other Party seeks relief under any bankruptcy or insolvency statute, makes an assignment for the benefit of creditors, or is placed in receivership.

(c) No termination of the Agreement for any reason will relieve or discharge a Party from any duty, obligation, or liability which arose or accrued as of the date of such termination (including, the obligation to pay any amounts owing as of such date of termination), nor will it affect in any manner whatsoever the ownership of the copyright and other intellectual property rights in and to the Series.

8.  **Force Majeure**:

Subject to Section 7 (c) above, in the event that either Party is prevented from performing any of its obligations under this Agreement or the production of the Series is prevented or delayed due to an act of God, strike, labor dispute, flood, fire, war or act of terrorism, riot or civil commotion, public disaster, order or act of government or any other cause or reason beyond such Party's control ("Force Majeure"), the Parties will meet in good faith and discuss alternative methods for continuing production of the Series during the continuation of the Force Majeure event. If such meetings do not result in a mutually agreeable resolution to the issues arising from the Force Majeure event, either Party, in its sole discretion, may terminate this Agreement without further obligation.

9.  **Assignment**:

Neither Party may assign its rights or obligations under this Agreement to any person or entity; except that either Party may assign its rights and obligations to any affiliated company or to any acquirer of all or substantially all of the assets of or equity interests in such Party.

10. **Miscellaneous**:

(a) Notices. Any notices, demands, consents, agreements, requests or other communications which may be or are required to be given, served or sent by any Party to any other Party or obtained from any Party pursuant to this Agreement must be in writing and must be (i) mailed by first-class mail, registered or certified, return receipt requested, postage prepaid; (ii) hand delivered personally by independent courier; or (iii) transmitted by fax addressed as follows:

If to Caracol:

>               Caracol Television S.A.
>               Calle 103, #69B-43
>               Bogotá D.C.

Colombia

If to TTS:

> Telemundo Television Studios, LLC
> 2290 West 8th Avenue
> Hialeah, Florida 33010
> Attn: Business Affairs Department
> Fax: 305-889-7926

Each Party may designate by notice in writing a new address to which any notice, demand, consent, agreement, request or communication may thereafter be so given, served or sent. Each notice, demand, consent, agreement, request or communication which is mailed, hand delivered or transmitted in the manner described above will be deemed received for all purposes at such time as it is delivered to the address (with the return receipt, the courier delivery receipt or the fax answer back confirmation being deemed conclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

(b) <u>Beneficiaries</u>. This Agreement will inure to the benefit of and be binding upon the Parties and their permitted successors and permitted assigns.

(c) <u>Insurance</u>. TTS shall at all times during the production of the Series, procure and maintain all reasonable, legally required and customary insurance mutually approved by the parties for the production of the Series in the country or countries where the series shall be produced. Upon the commencement of pre-production for each Series, TTS will deliver to Caracol appropriate certificates of insurance or endorsements indicating that:

   1. Caracol, its parent(s), subsidiaries, related and affiliated companies, successors and licensees and their officers, directors, employees, representatives, agents and assigns of the foregoing   (collectively the "**Caracol Entities**") will be included as additional insured under the insurance described herein.

   2. Such insurance is primary to and noncontributory with all other insurance available to such additional insured.

   3. Will provide Caracol with thirty (30) calendar days prior written notice of cancellation of any of the insurance required herein.

   4. It is expressly understood that any and all deductibles relating to any losses and claims filed under such insurance will be borne solely by TTS.

In addition, TTS will use commercially reasonable efforts to obtain certificates of  insurance or endorsements that include a provision indicating that the insurer waives all rights of subrogation against the Caracol Entities.   TTS shall furnish Caracol with the appropriate certificates of insurance or endorsements stating and certifying the amounts and types of insurance and that the Caracol Entities are additional insured under such insurance.



(d) Dispute Resolution, Applicable Law and Forum. This Agreement, the rights and obligations of the Parties, and any claims or disputes relating in any way thereto will  governed by the laws of the State of Florida, without regard to its choice of law principles.  Any dispute arising out of this Agreement shall be resolved according to the procedures set forth in this section, which shall constitute the sole dispute resolution mechanisms hereunder.  In the event that the Parties are unable to resolve any dispute after meeting and attempting in good faith to reach a negotiated resolution, such dispute(s) shall be resolved through binding arbitration conducted according to the JAMS Comprehensive Arbitration Rules and Procedures in effect as of the date hereof (the "Arbitration Rules").  The seat of arbitration shall be Miami-Dade County, before a single neutral arbitrator appointed in accordance with the Arbitration Rules. The arbitration will be a confidential proceeding, close to the general public. The arbitrator will issue a written opinion stating the essential findings and conclusions upon which the arbitrator's award is based. The Arbitrator will be prohibited from granting a costs award to either Party. The Parties will share equally in payment of the arbitrator's fee and arbitration and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorneys' fees and other expenses to same extent as if the matter were being heard in court). If either Party refuses to perform any or all of its obligations under the final arbitration award within thirty (30) days of such award being rendered, then the other Party may enforce the final award in any court of competent jurisdiction in Miami-Dade County, and each of the Parties hereto unconditionally submits to the jurisdiction of such court for the purpose of any proceeding seeking such enforcement. The Parties shall maintain the confidential nature of the arbitration proceeding and any award, including any arbitration hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision. The Parties hereto waive, to the fullest extent they may do so effectively under applicable law, any objection they may have to the laying of the venue of any proceeding or that any proceeding brought in Miami-Dade County has been brought in an inconvenient forum.  The Parties expressly waive any right to a jury trial.

(e) Counterpart. This Agreement may be executed in counterparts, and it will not be necessary that the signatures on behalf of each Party appear on each counterpart.  All counterparts will collectively constitute a single Agreement.

(f) Modification. This Agreement may not be amended or modified or any provision or obligation waived or changed except by a writing executed by the Parties.

(g) Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement and any such prohibition or enforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction.  To the maximum extent permitted by applicable law, the Parties waive any provision of law that renders any provision of this Agreement prohibited or unenforceable in any respect.





(h) No waiver. No failure or delay of any Party in exercising any power or right under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof of the exercise of any other right or power.

(i) Confidentiality. No party to this agreement will disclose, directly or indirectly, in whole or in part, to any third person, firm or corporation, any Confidential Information (as defined below) which it receives or may previously have received from the other party, except that any such information may be disclosed to a party's directors, officers and employees in connection with the Agreement, to the extent that party reasonably determines such disclosure to be necessary. Neither party will use the Confidential Information for its own benefit, or copy or reproduce the Confidential Information, except as provided in this section. Each party will use the same degree of care in safeguarding the Confidential Information as it uses for its own confidential and proprietary information.

For purposes of this Agreement, "Confidential Information" will mean any and all information, scripts, data, reports, summaries, documentation, and materials provided or disclosed by any party to the other party in connection with the Agreement and/or the information deemed confidential relating to the businesses, operations and affairs of any party thereto and its related and affiliated companies. Notwithstanding the foregoing, information and data disclosed will not be deemed to be Confidential Information, and the receiving party will have no obligation to treat such information and data as Confidential Information if, such information and data (a) before being used or disclosed by any party has become publicly known through no wrongful act of that party or has been approved for release by written authorization of the party owing such Confidential Information; (b) was already known to or in possession of the other party; (c) has been independently developed by the other party, its employees or contractors without prior access to any Confidential Information; (c) or has been disclosed pursuant to a requirement of a government agency, or of law, provided prior notice of such required disclosure is given to the disclosing party.

(j) No Third Party Beneficiary. The provisions of this Agreement are solely for the benefit of the Parties and are not intended to benefit any third party, whether sponsors, viewers or otherwise, and no third party will be deemed to have any privity of contract by virtue of this Agreement.

(k) Relationship of the Parties. The relationship between the Parties is that of two principals dealing with each other as independent contractors. This Agreement does not create and it is not the intention of the Parties to create a partnership, joint venture, association or trust between the Parties.  Neither Party has the right, power or authority at any time to act on behalf of, or represent, the other Party, but each Party hereto will be separately and entirely liable for its own debts in all respects. No agency relationship is intended to be created by this Agreement.

(l) Remedies. No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy which is otherwise available at law, in equity, by statue or otherwise and except as otherwise expressly provided for in this Agreement.  The election of one or more of such remedies by any Party will not constitute a waiver by such Party of the right to pursue any other available remedies.



(m) <u>Captions</u>. Section or other headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No provision of the Agreement will be interpreted for or against any party because that party or its legal representative drafted the provision.

(n) <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties with respect to its subject matter and supersedes all prior written and oral agreements and understandings of any kinds.

**EXECUTED** by the Parties on the date set out at the head of this Agreement.

**ACCEPTED AND AGREED**

**TELEMUNDO TELEVISION STUDIOS LLC**

By: _____

Name: _W Scott Seeley_

Title: _Sr. VP_

By: _Javier Maynulet_

Javier Maynulet

Chief Financial Officer

**CARACOL TELEVISION S.A.**

By: _____

Print Name: _JORGE MARTINGZ_
Title: _SECRETARU GENERAL_

Exhibit B

## INTERNATIONAL DISTRIBUTION AGREEMENT

This International Distribution Agreement ("Distribution Agreement") is made as of October 25, 2012 (the "Effective Date"), by and between **Telemundo Internacional, LLC,** a company organized and validly existing under the laws of the State of Delaware, USA, hereby duly represented by the undersigned **("TI"),** and Caracol Televisión S.A., a company organized and validly existing under the laws of Colombia hereby duly represented by the undersigned **("Caracol").** TI and Caracol are hereinafter jointly referred to as the "Parties".

1. **Conditions Precedent**:

The Parties' obligations under this Distribution Agreement are conditioned upon and subject to the concurrent execution of a Co-Production Agreement ("Co-Production Agreement") between Telemundo Television Studios LLC ("TTS") and Caracol, if these conditions are not satisfied, the Distribution Agreement will terminate, and neither Party will have any further obligation to the other.

2. **Definitions**:

Except as otherwise provided herein, capitalized terms in this Agreement shall have the meaning ascribed to them below.

| | |
|---|---|
| "**Accounting Period**" | Has the meaning set forth in Section 7.2. |
| "**Accounting Statement**" | Has the meaning set forth in Section 7.4. |
| "**Additional Delivery Material**" | Other material to be agreed by the Parties, including pre- and post-sale material and promotional material pertaining to the Series. |
| "**Caracol Distribution Territories**" | To Be Determined. |
| "**Delivery Material**" | Sub-masters of the Series in either (i) HD NSTC Pal or Hard Drive HD Pal format (and as further provided in Section 8), with respective transcripts, M&E track and music cue sheets. |
| "**Distributor**" | Either TI or Caracol, depending on whether it is a Telemundo Distribution Territory or a Caracol Distribution Territory. |
| "**Exploitation Rights**" | The right to: |

    i)     Record and publish the Series, whether edited or not;

ii)     reproduce and adapt the Series;

iii)    sample and/or play-back and/or post-synchronize, publish on any width of films, videotapes and videocassettes, videodisks, CD-videos, CD's, Cdi, sound tapes, films, tape slides, photos, holographs, three dimensional representations, digital and computer recordings of the Series;

iv)     exploit the recording and reproduction/adaptations of the Series on picture and sound carriers such as wide-screen HDTV, CDROM, computer networks (for example Internet) and interactive TV;

v)      offer and have in stock, broadcast or cause to be broadcast and distributed by all media in whatever manner or frequency, whether such media are known and existing now or in the future (including but not limited to digital TV, free TV, pay TV, Pay-Per-View, VOD, NVOD, theatrical and non-theatrical releases, videos, Internet, and similar or ancillary media) the Series;

vi)     any other publication or multiplication in whatever manner of the Series or reproductions or adaptations thereof, or any other exploitation possible presently or in the future;

vii)    the right to exploit any and all ancillary rights in and to the Series. Ancillary Rights includes Home Entertainment/Home Video, Mobile, Internet, Streaming VOD, NVOD, including (a) the right to sublicense the Exploitation Rights of the Ancillary Rights consisting of Home Entertainment/Home Video to any third party, including local Home Video distributors in either the Telemundo Distribution Territories or the Caracol Distribution Territories, as the case may be;   (b) the right to sublicense the Exploitation Rights of the Ancillary Rights consisting of Mobile exploitations to any third party, including local Mobile carriers in either the Caracol Distribution Territories or the Telemundo Distribution Territories, as the case may be, but, for the avoidance of doubt, Mobile Exploitations may include the Mobile carriers' customers right to activate the roaming functionality in their Mobile devices and



thereby have access to the Series in territories located outside of the corresponding Telemundo Distribution Territories and/or Caracol Distribution Territories, where the sublicenses with the Mobile carriers were originally closed; and (c) the right to sublicense the Exploitation Rights of the ancillary rights consisting of Internet, Streaming, VOD (on the Internet), to any third party (including Internet carriers and/or aggregators) with a principal office or base of operations located in either the Telemundo Distribution Territories or the Caracol Distribution Territories, as the case may be, provided that (1) should Distributor intend to sublicense such rights on an exclusive basis for any of its respective Territories, Distributor shall fully consult with the other party before closing any such deal; and/or (2) should Distributor intend to sublicense such rights in a way that may reach territories outside the respective Telemundo Distribution Territories and/or Caracol Distribution Territories, Distributor shall always do it on a non-exclusive basis and must fully consult with and obtain written authorization from the other Party, before closing any such deal. For the avoidance of doubt, sublicensees referred to in this subsection, reaching territories outside the respective Telemundo Distribution Territories and/or the Caracol Distribution Territories, as the case may be, shall not reach Mexico, nor USA (sublicenses entered into by Caracol), or Colombia (sublicenses entered into by Telemundo).

viii)   the right to sublicense Exploitation Rights under i) – vii) to any third party, including television distributors in the Telemundo Distribution Territories and the Caracol Distribution Territories respectively ("Sublicense");

**"Gross Revenues"**   100% of all gross money and income of every kind actually received directly or indirectly by either Distributor, from the exercise of their Exploitation Rights in their respective Territories. In any such case,




the Gross Revenues shall include all sums arising whether or not by way of judgment, settlement or compromise for infringement or interference with any of the Exploitation Rights, and any and all advances, minimum guarantees and security deposits whether or not earned, refundable or recoupable;

"**Net Revenues**"    Gross Revenues less (a) any applicable Taxes; (b) the reasonable costs of dubbing or subtitling the Program to other languages, as are necessary in order to license the Series to different markets pursuant to the terms of this Agreement; (c) expenses incurred by the Distributor for the copying and delivering of the material/tapes ("Copying and Delivery Costs") necessary for the exercise of the Exploitation Rights, as the case may be. The expenses referred to in (b) and (c) above shall be limited to an amount to be agreed by the Parties. The Parties agree to use their best efforts to minimize dubbing or subtitling, as well as the Copying and Delivery Costs, and to use the delivery technique commonly known in the television industry as "Bicycling" where clients send each other materials directly. The total of the expenses identified in (b) and (c) above will be capped at five percent (5%) of Gross Revenues (excluding subtitling and dubbing costs previously approved by both Parties).

"**Series**"    As defined in the Co-Production Agreement.

"**Taxes**"    The withholding tax, or any other comparable tax, if any, which the Distributor may be required to pay on the Gross Revenues in the country from which such Gross Revenues originate, excluding however any corporate income tax or any other tax which the Distributor may be required to pay if it is deemed to have a permanent establishment in such country.

"**Telemundo    Distribution** Territories**"**    Mexico, and such other Territories as the Parties may mutually agree.

"**Territories**"    Telemundo Distribution Territories and Caracol Distribution Territories may be collectively referred to as Territories.

3. **Term**:



3.1     This Distribution Agreement is in effect for ten (10) years from the earlier of (i) beginning of: (i) beginning of the first exhibition in the US (or Puerto Rico); or (ii) one year from the end of the production, subject to earlier termination under Section 16 ("Termination"). The Parties may start promoting the Series to any potential clients as of the Effective Date, but the Parties will mutually agree on an official launch date of the Series in the international market.   For the avoidance of doubt, the Term of this Agreement is not related to the duration of any license entered into with clients, which Licenses may extend beyond the expiration of the Term.

3.2     Upon termination of this Distribution Agreement, neither party may exploit the Series without the written consent of the other.

## 4. **Grant of Rights**:

4.1.    TI will have the exclusive right to exercise the Exploitation Rights in and to the Series in the Telemundo Distribution Territories.

4.2.    Caracol will have the exclusive right to exercise the Exploitation in and to the Series in the Caracol Distribution Territories.

## 5.   **Distribution of the Series:**

5.1.    TI agrees to make the Delivery Material available for the exercise of the Rights by Caracol, duly edited and formatted as a continuous and sequential telenovela consisting of episodes of an average running time of 42-45 minutes.

5.2.    No later than thirty (30) days after commencement of the production of the Series, the Parties will agree on: (i) the countries and/or regions to be included in the  definitions of Telemundo Distribution Territories and/or Caracol Distribution Territories respectively, except that Mexico shall remain a Telemundo Distribution Territory, with a minimum guaranteed gross price per episode of Thirteen Thousand Dollars (USD \$13,000.00); and (ii) a minimum gross price per episode of the Series to be applied to the sublicenses in each region or country included in the Parties' respective Territories ("Minimum Regional Price").

5.3.    Distributor will have exclusive control over all matters relating to the Exploitation Rights in its Territories, provided that all Sublicenses of "re-runs" to the Series, as this term is commonly understood in the business, will be at a minimum re-run price of fifty-percent (50%) of the initial or first run price applied in that Territory (with the exception of Mexico) in accordance with Schedule A.  Notwithstanding the foregoing, TI will use reasonable commercial efforts to obtain a fifty-percent (50%) of the initial or first run price for the re-run in the territory of Mexico.

5.4.    Distributor shall each use its best efforts to exercise the Rights to its full potential in its respective Territories. The exercise of the Exploitation Rights with any third parties by Distributor will be on an arm's length basis.



5.5.   Any and all agreements executed by Distributor in connection with the exercise of the Exploitation Rights will (i) incorporate the applicable terms of this Distribution Agreement; (ii) be consistent with industry custom and practice; and (iii) will be made and entered into by Distributor under its own name and not as an agent of the other Party to this Distribution Agreement.

5.6.   Upon execution of this International Distribution Agreement, the Parties will mutually agree on a process and guidelines related to the screening of sublicensees (i.e., know your customer) to be implemented by the Parties prior to execution of any Sublicense.

5.7.   TI and Caracol will comply with all laws, regulations, statutes and legal rules of any kind in effect within their respective Territories, and shall not engage in irregular practices or transactions that could adversely affect the reputation of either Distributor or its respective trade name.

5.8.   Caracol will distribute the Series as provided by TI, without any changes, additions, or deletions, provided that Caracol (and its sublicensees) may only make (i) changes strictly necessary to comply with local laws, regulations, censorship requirements and/or (ii) minor edits to adjust to time segment requirements. Any other edits or changes will require written approval by the Parties.

5.9.   The Parties undertake to negotiate and agree in good faith regarding the dates for the delivery of the Additional Material and the operational details and mechanisms of the international distribution of the Series.

6.   **Consideration**:

6.1.   In connection with the exercise of the Exploitation Rights in the Telemundo Distribution Territories, TI shall pay to Caracol fifty percent (50%) of Net Revenues.

6.2.   In connection with the exercise of the Exploitation Rights in the Caracol Territories, Caracol shall pay to TI fifty percent (50%) of Net Revenues.

6.3.   The Parties agree that no distribution commissions or fees will be charged by either party.

6.4.   All costs and expenses relating to promotional and marketing efforts for the international distribution of the Series incurred by each Party shall be entirely borne by such Party (and may not be deducted from the Gross Revenues for revenue split purposes). Notwithstanding the foregoing, the Parties may agree to share costs and expenses for special promotions, marketing or public relations campaigns, efforts or events as agreed from time to time by the Parties.

6.5.   Distributor will deliver to the other Party the relevant Tax certificate evidencing any and all amounts withheld for tax purposes, if any.

7.   **Accounting Records & Payments**:





7.1.   The Parties will maintain true and accurate books of account and records which will reflect all revenues and expenses of the Parties' Exploitation Rights under this Distribution Agreement. Each Party shall render to the other within thirty (30) days counting from the end of each calendar quarter ("Accounting Period") a statement including:

7.2.   The Gross Revenues obtained from the exercise of the Exploitation Rights, during the applicable Accounting Period including the following information regarding the Sublicenses signed by Distributor: name of sublicensee, term, and price per episode.

7.3.   A statement of sales and accounts reflecting, in summary form, the Gross Revenues and amounts withheld, payable or deductible thereunder ("Accounting Statement"). Accounting Statements may be changed from time to time to reflect year-end adjustments, to correct errors and for similar purposes.

7.4.   Any amounts due and payable hereunder for the period covered by any Accounting Statement shall be paid by the relevant party to the other, in US Dollars, no later than ten (10) days upon receipt of the invoice by the applicable Party.

7.5.   Subject to the applicable laws, if either Party owes the other any amounts under this Distribution Agreement and, at the same time such Party has a credit against the other Party under this Distribution Agreement, the Parties may, upon notification and approval by the receiving Party, compensate any amounts due and pay the balance, if any, to the other Party.

7.6.   Distributor shall keep accurate and detailed records and books of account relating to any exercise of its respective Exploitation Rights. Each Party is entitled to exercise audit rights, no more than once in each calendar year providing reasonable notice and during normal business hours, to inspect such records and books of account. Any inspection shall be at the Party's own cost unless any such examination of the records reveals an underpayment to such other Party of more than 10% in which case Distributor shall reimburse the reasonable costs of the inspection to the other Party. Notwithstanding the foregoing, a Report will be deemed correct and no longer subject to dispute by either Party twelve (12) months after the date such Report was delivered to such Party, unless the Report is rendered during a period subject to a pending audit.

7.7.   All payments will be made in United States Dollars by wire transfer to the following accounts or to a different Caracol or TI account to be designated by the Parties in                                                                                    writing:

   **If to Caracol**

   **Name on Account:**   Caracol Televisión S.A
   **Name of Bank:** BANCO DE BOGOTA MIAMI AGENCY FEDERAL RESERVE BANK

   **Bank Address**: 701 Brickell Avenue, Suite 1450. Miami, Fl. 33131



Account Number: 57299
Swift code N°: BBOGUS3M
ABA #: 066010720

### If to TI:

Name on Account: Telemundo Internacional, LLC
Name of the bank: Bank of America
Bank Address: 901 Main Street, Dallas, TX 75202
Account Number: 4426366968
Swift code N°: BOFAUS3N
ABA #: 026009593

## 8.    Delivery Material:

8.1.    TI shall make available to Caracol for exploitation as provided in this Agreement the Delivery Material and the Additional Delivery Material. The Delivery Material and the Additional Delivery Material shall be of a quality standard to be agreed by the Parties.

8.2.    Caracol will inspect and examine the Delivery Material and the Additional Delivery Material immediately upon receipt. In the event Caracol rejects the technical quality of the Delivery Material and the Additional Delivery Material for failure to meet the standards mutually agreed in the Co-Production Agreement, it shall notify TI no later than thirty (30) days after receipt of such material, upon which TI shall deliver at its own expense the replacing Delivery Material and the Additional Delivery Material of the requested quality within thirty (30) days thereafter.

## 9.    Credits & Promotion of the Series:

9.1.    If available, TI will provide Caracol with a list of all required screen credits (if not already contained in the Series), publicity, billing and promotional requirements and other credit requirements (if needed) as soon as possible after receipt by Caracol of the Delivery Material and in any event within seven (7) days of receipt of the Delivery Materials. In the event a third party fails to meet these requirements, the Parties shall notify each other and shall use commercially reasonable endeavors to correct such failure.

9.2.    Distributor (and its sublicensees) shall each have the exclusive right within its territory to exercise, at its own expense and subject to any restrictions and third party encumbrances, the right to:

a.    Advertise, publish and promote the Series;

b.    use the name, voice and likeness of any person who has rendered services on the Series for purposes of advertising, promotion or publicity of the Series but such use will



00022771 - 18

not be as an endorsement of any product or service without such person's written consent; and

c. to include in all such advertising, promotion or publicity for the Series excerpts from the Series;

9.3. Each party shall grant to the other, in its capacity of Distributor, the non-exclusive royalty-free license to use, copy and display its trademark in connection with the exercise of Exploitation Rights throughout their Territory. Distributor agrees to use such trademark in accordance with a reasonable standard of care or in accordance with such other standard or specification as the relevant party may communicate to the other from time to time.

10. **Dubbing and Subtitles**:

10.1. Distributor shall have the non-exclusive right to dub or subtitle each Series at its sole expense and to deduct the costs of such dubbing or subtitling from the Gross Revenues subject to the other party's approval and pursuant to the terms set forth in the "Net Revenues" definition, in which case the dubbed version shall belong to both Caracol and TI. Distributor shall, upon availability, provide access to the dubbed and/or subtitled version to the other party, provided that such other party shall bear any eventual residual/neighboring rights arising out of its (and its sublicensees') use of such material.

10.2. If a licensee of a Distributor produces the dubbed version, such Distributor shall use its reasonable commercial efforts to have access to such dubbed version and to give access to it to the other Distributor, pursuant to the conditions stated in 10.1 above.

11. **Intellectual Property Rights**:

11.1. The copyright and other intellectual property rights in and to the Series, their translation and adaptations, their title and all other elements of, or appearing in the Series, or created pursuant to them are exclusively governed by the Co-Production Agreement.

11.2. Distributor shall not exploit or authorize the use of the other party's trademark or logos other than as specifically provided for in this Agreement, nor shall Distributor exploit or make use of the other party's logos, trade name or trademarks, or any translation without such Party's prior written approval. All logos, trademarks or trade names related to the Series may be used free of any extra charges by Distributor, in connection with the exploitation of any rights granted to Distributor under this Agreement.

11.3. Distributor will exercise its best efforts to obtain from any sublicensees the rights to any and all additions, changes and modifications made by the sublicense to the Series to the exclusive benefit of Distributor.

11.4. Distributor shall take reasonable steps to protect the copyright in the Series and to prevent the unauthorized exploitation of the Program in its respective Territories. Distributor will keep the other Party informed of any possible unauthorized use it finds. Distributor may in any anti-piracy action use its own counsel and the other party shall





render all assistance as may be required by Distributor in this regard. If the relevant anti-piracy action is approved by both Parties, Distributor's expenses shall be reimbursed from any recovery equally with the other party's pro rata (considering the same percentages provided for in Section 6) in the borne expenses.

12. **Music**:

TI shall supply Caracol with available music cue sheets listing the composer, lyricist and publisher of all music embodied in the Series. TI shall have the right to determine the soundtrack of the Series as between Caracol and TI. Telemundo Television Studios ("TTS") an affiliate of TI shall be the party responsible for the clearance and payment of all music synchronization rights in connection with the Series, in perpetuity and worldwide. The music rights payments shall be part of the budget of the Series, and any additional payment shall be borne exclusively by TTS.. All license agreements with broadcasters entered into by Caracol or TI will require the broadcaster to pay any music performance royalties due as the result of such broadcaster's exploitation of the Series.

13. **Warranties**:

EACH PARTY IN ITS CAPACITY AS DISTRIBUTOR WARRANTS, REPRESENTS AND COVENANTS THAT:

13. 1.  It is free to enter into and fully perform the rights and obligations set out in this Agreement;

13.2.  it shall notify the other Party immediately of any infringements or violations in the Territories or elsewhere of any rights referred to hereunder that come to the attention of Distributor;

13.3.  it shall comply with all laws and regulations applicable to its exercise of its rights and performance of its obligations hereunder. In the event any governmental agency shall object to transmission or exhibition of the Series, it shall immediately notify the other Party of such objection;

13.4.  it shall secure any music performing rights, licenses necessary for the broadcast of the music contained in the Series in its Territories, shall make its relevant  sublicensees pay such music performing rights monies and shall hold the other Party harmless from any liability or damages arising from failure to do so.

13.5.  TI and Caracol hereby warrant, represents and covenants to each other, as applicable, that:

a. with respect to the Series, it: (i) has or will have the rights and authorizations (whether by ownership or license) to grant the rights granted to Distributor, including without limitation, the necessary literary, artistic, technological and intellectual property rights; (ii) has secured or will secure all rights, license, clearances and releases necessary for the exercise by Distributor (and its sublicensees) of the rights granted hereunder except for



music performance rights; and (iii) Distributor's (and its sublicensees') use of the Series shall not oblige Distributor (or its sublicensees) to make any payments to any third parties other than with respect to music performance license fees;

b. the Series shall not contain any material which violates any applicable law or regulation;

c. the Series does not infringe and will not infringe on any rights of any third party, including but not limited to copyright, patent, trademark, unfair competition, contract, property, privacy, publicity or moral rights ("Thirty Party Rights"), and Distributors' (and its sublicensees') exercise of the Exploitation Rights in accordance with this Agreement will not infringe on any Third Party Rights;

 d. it will not hereafter sell, assign, transfer, license, convey, mortgage or otherwise deal in or encumber any right, title or interest in or to the Series which would be materially adverse to or derogate from the rights granted hereunder and will not perform any other act or omission which would be materially adverse to or derogate from the rights granted hereunder and will not perform any other act or omission which would be materially adverse to or derogate from the rights granted to Distributor under this Agreement;

e. it shall comply with all laws and regulations applicable to Distributor's exercise of its rights and performance of its obligations hereunder. In the event that any governmental agency shall object to the transmission or exhibition of the Series hereunder, it shall immediately notify the other Party of such objection and the Parties shall consult regarding the steps to be taken;

f. the music performing rights in each musical composition contained in the Series are and shall be (i) in the public domain in the relevant Territories; (ii) sufficiently controlled by TTSto allow Distributor to exercise the Exploitation Rights without the necessity of any additional payment; or (iii) available by license from the local music performing rights society in the relevant Territories.

14.   **Indemnification**:

Section 7.e of the Co-Production Agreement that contains Indemnity Language is incorporated herein by reference and shall apply as well to any claims asserted by a third party against an Indemnified Party (as defined in the Co-Production Agreement) with respect to any alleged breach of a representation, warranty, agreement or covenants contained herein.

15.   **Force Majeure**:

Subject to Section 16.3. below, in the event that either Party is prevented from performing any of its obligations under this Agreement or the production of the Series is prevented or delayed due to  an act of God, strike, labor dispute, flood, fire, war or act of terrorism, riot or civil commotion, public disaster, order or act of government or any other cause or reason beyond such Party's control ("Force Majeure"), the Parties will meet in good faith and discuss alternative methods for continuing the distribution of the Series during the continuation of the Force





Majeure event. If such meetings do not result in a mutually agreeable resolution to the issues arising from the Force Majeure event, either Party, in its sole discretion, may terminate this Agreement without further obligation.

16.   **Default and Termination**:

16.1.  Either Party may terminate this Agreement upon the commission of (i) a material breach of this Agreement by the other Party which is not capable of remedy or (ii) a material breach of this Agreement by the other Party which is capable of remedy, but which has not been remedied within a period of thirty (30) days after the non-breaching Party has delivered notice to the breaching Party specifying the breach and requiring it to be remedied; provided, however, that such thirty (30) day period will be extended for such additional period as will be reasonably necessary if such breach is incapable of remedy within thirty (30) days and during such period the breaching Party diligently endeavored to remedy the breach.

16.2.  Either Party will have the right, in addition to any other rights and remedies it may have, to terminate this Agreement if the other Party seeks relief under any bankruptcy or insolvency statute, makes an assignment for the benefit of creditors, or is placed in receivership.

16.3.  No termination of the Agreement for any reason will relieve or discharge a Party from any duty, obligation, or liability which arose or accrued prior to the date of such termination (including, the obligation to pay any amounts owing as of such date of termination), nor will it affect in any manner whatsoever the ownership of the copyright and other intellectual property rights in and to the Series.

17.   **Assignment**:

Notwithstanding the right of each Distributor to sublicense the Exploitation Rights under this Agreement, no Party shall assign, transfer, sublicense or in any way dispose of any of its rights or interests hereunder to any third party, without the prior written consent of the other Party, except (i) as provided in this Agreement and (ii) that both Parties may assign all its rights and obligations hereunder to one of its Affiliates, in which case such assigning party will remain jointly liable with such Affiliate for the obligations assumed by such assigning Party hereunder.

18.   **Miscellaneous**:

18.1.  <u>Notices</u>. Any notices, demands, consents, agreements, requests or other communications which may be or are required to be given, served or sent by any Party to any other Party or obtained from any Party pursuant to this Distribution Agreement must be in writing and must be (i) mailed by first-class mail, registered or certified, return receipt requested, postage prepaid; (ii) hand delivered personally by independent courier; or (iii) transmitted by fax addressed as follows:

      (1)    If to Caracol:

          Caracol Televisión S.A.



Calle 103, #69B-43
Bogotá D.C.
Colombia

(2)     If to TI:

Telemundo Internacional LLC
2290 West 8th Avenue
Hialeah, Florida 33010
Attn:  Business Affairs Department
Fax:  305-889-7926

18.2.   <u>Designation</u>. Each Party may designate by notice in writing a new address to which any notice, demand, consent, agreement, request or communication may thereafter be so given, served or sent.     Each notice, demand, consent, agreement, request or communication which is mailed, hand delivered or transmitted in the manner described above will be deemed received for all purposes at such time as it is delivered to the address (with the return receipt, the courier delivery receipt or the fax answer back confirmation being deemed conclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

18.3    <u>Beneficiaries</u>. This Distribution Agreement will inure to the benefit of and be binding upon the Parties and their permitted successors and permitted assigns.

18.4    <u>Dispute Resolution, Applicable Law and Forum</u>.   This Agreement, the rights and obligations of the Parties, and any claims or disputes relating in any way thereto will governed by the laws of the State of Florida, without regard to its choice of law principles.  Any dispute arising out of this Agreement shall be resolved according to the procedures set forth in this section, which shall constitute the sole dispute resolution mechanisms hereunder.  In the event that the Parties are unable to resolve any dispute after meeting and attempting in good faith to reach a negotiated resolution, such dispute(s) shall be resolved through binding arbitration conducted according to the JAMS Comprehensive Arbitration Rules and Procedures in effect as of the date hereof (the "<u>Arbitration Rules</u>").  The seat of arbitration shall be Miami-Dade County, before a single neutral arbitrator appointed in accordance with the Arbitration Rules.  The arbitration will be a confidential proceeding, close to the general public. The arbitrator will issue a written opinion stating the essential findings and conclusions upon which the arbitrator's award is based. The Arbitrator will be prohibited from granting a costs award to either Party. The Parties will share equally in payment of the arbitrator's fee and arbitration and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorneys' fees and other expenses to same extent as if the matter were being heard in court). If either Party refuses to perform any or all of its obligations under the final arbitration award within thirty (30) days of such award being rendered, then the other Party may enforce the final award in any court of competent jurisdiction in Miami-Dade County, and each of the Parties hereto unconditionally submits to the jurisdiction of such court for the purpose of any



proceeding seeking such enforcement. The Parties shall maintain the confidential nature of the arbitration proceeding and any award, including any arbitration hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision. The Parties hereto waive, to the fullest extent they may do so effectively under applicable law, any objection they may have to the laying of the venue of any proceeding or that any proceeding brought in Miami-Dade County has been brought in an inconvenient forum. The Parties expressly waive any right to a jury trial.

18.5    Counterparts. This Distribution Agreement may be executed in counterparts, and it will not be necessary that the signatures on behalf of each Party appear on each counterpart. All counterparts will collectively constitute a single Agreement.

18.6    Modification. This Distribution Agreement may not be amended or modified or any provision or obligation waived or changed except by a writing executed by the Parties.

18.7    Severability. Any provision of this Distribution Agreement that is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Distribution Agreement and any such prohibition or enforceability in any jurisdiction will not invalidate or render unenforceable such provision in any other jurisdiction. To the maximum extent permitted by applicable law, the Parties waive any provision of law that renders any provision of this Distribution Agreement prohibited or unenforceable in any respect.

18.8    No Waiver. No failure or delay of any Party in exercising any power or right under this Distribution Agreement will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof of the exercise of any other right or power.

18.9    Confidentiality. No party to this Agreement will disclose, directly or indirectly, in whole or in part, to any third person, firm or corporation, any Confidential Information (as defined below) which it receives or may previously have received from the other party, except that any such information may be disclosed to a party's employees in connection with the Agreement, to the extent that party reasonably determines such disclosure to be necessary. Neither party will use the Confidential Information for its own benefit, or copy or reproduce the Confidential Information, except as provided in this section. Each party will use the same degree of care in safeguarding the Confidential Information as it uses for its non confidential and proprietary information.

For purposes of this Agreement, "Confidential Information" will mean any and all information, scripts, data, reports, summaries, documentation, and materials provided or disclosed by any party to the other party in connection with the Agreement and/or the businesses, operations and affairs of any party thereto and its related and affiliated




companies. Notwithstanding the foregoing, information and data disclosed will not be deemed to be Confidential Information, and the receiving party will have no obligation to treat such information and data as Confidential Information if, such information and data (i) before being used or disclosed by any party has become publicly known through no wrongful act of that party or has been approved for release by written authorization of the party owing such Confidential Information; (ii) was already known to or in possession of the other party; (iii) has independently been developed by the other party, its employees or contractors without prior access to any Confidential Information; (iv) or has been disclosed pursuant to a requirement of a government agency, or of law, provided prior notice of such required disclosure is given to the disclosing party.

18.10   No Third Party Beneficiary. The provisions of this Distribution Agreement are solely for the benefit of the Parties and are not intended to benefit any third party, whether sponsors, viewers or otherwise, and no third party will be deemed to have any privity of contract by virtue of this Distribution Agreement.

18.11   Relationship of the Parties. The relationship between the Parties is that of two (2) principals dealing with each other as independent contractors.  This Agreement does not create and it is not the intention of the Parties to create a partnership, joint venture, association or trust between the Parties.  Neither Party has the right, power or authority at any time to act on behalf of, or represent, the other Party, but each Party hereto will be separately and entirely liable for its own debts in all respects. No agency relationship is intended to be created by this Agreement.

18.12   Remedies. No remedy conferred by any of the specific provisions of this Distribution Agreement is intended to be exclusive of any other remedy which is otherwise available at law, in equity, by statue or otherwise and except as otherwise expressly provided for in this Distribution Agreement.  The election of one or more of such remedies by any Party will not constitute a waiver by such Party of the right to pursue any other available remedies.

18.13   Captions. Section or other headings contained in this Distribution Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Distribution Agreement.  No provision of the Distribution Agreement will be interpreted for or against any party because that party or its legal representative drafted the provision.

18.14   Entire Agreement. This Distribution Agreement constitutes the entire agreement of the Parties with respect to its subject matter and supersedes all prior written and oral agreements and understandings of any kinds.



AS AN EXPRESSION OF THEIR CONSENT, the Parties shall initial every page and sign at the bottom of three copies of the present Agreement, at the place and on the date indicated above, in the presence of the two undersigned witnesses.

EXECUTED by the Parties on the date set out at the head of this Agreement.

ACCEPTED AND AGREED

TELEMUNDO INTERNACIONAL LLC

By: _____          By: _____
Marcos Santana                                Javier Maynulet
President                                            Treasurer


CARACOL TELEVISION S.A.

By: _____

Print Name: JORGE MARTINEZ
Title: SECRETARIO GENERAL

# SCHEDULE A

## To be Determined

Exhibit C



**TELEMUNDO**
A Division of NBC Universal

**MELANIE M. MONTENEGRO**
VP. Business & Legal Affairs
Dir 305 889-7929
Melanie.Montenegro@nbcuni.com

August 27, 2013

*VIA CERTIFIED MAIL & ELECTRONIC E-MAIL (fboshell@caracoltv.com.co)*

Mr. Felipe Boshell
General Manager
Caracol Television S.A.
Calle 103, #69B-43
Bogotá D.C.
Colombia

      **Re:    El Señor de Los Cielos Sequel**

Dear Mr. Boshell,

      This offer letter is being provided to you pursuant to Section 5(b) of the Co-Production Agreement dated as of October 25, 2012, as amended on March 11, 2013 (collectively, the "Agreement") between Telemundo Television Studios, LLC ("TTS") and Caracol Television, S.A. ("Caracol"). We are pleased to confirm the offer by TTS to produce a sequel of the telenovela "El Senor de los Cielos" (the "Series") as communicated to you via e-mail on June 18, 2013, and consistent with the provisions more fully described in the Term Sheet (the "Term Sheet") attached hereto as <u>Annex A</u>. All capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Agreement.

      By executing this Offer Letter, you hereby agree that this Term Sheet constitutes a binding agreement with respect to the transactions contemplated herein and acknowledge that Caracol has agreed to the terms and conditions of the Term Sheet which will be incorporated into subsequent long-form agreement(s), including a License Agreement between Caracol and TTS.

      This Offer Letter, including the Term Sheet, shall be in all respects governed by and construed in accordance with the laws of the State of Florida. All claims arising out of or relating to the Offer Letter shall be litigated exclusively in the federal or state courts of Miami Dade, Florida, and each party consents to personal jurisdiction in those courts. No amendment, modification or discharge of this Agreement, and no waiver hereunder shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought. No delay or failure at any time on the part of any party in exercising any right, power or privilege under this Offer Letter, or in enforcing any provision of the Term Sheet, shall impair any such right, power or privilege, or be construed as a waiver of such provision, or be construed as a waiver of



Mr. Felipe Boshell
August 27, 2013
Page 2

any default or acquiescence therein, or shall affect the right of such party thereafter to enforce each and
every provision of this Offer Letter in accordance with its terms.

Should you have any questions, as always, please feel free to contact me.

Sincerely,

**TELEMUNDO TELEVISION STUDIOS, LLC**

JAVIER MAYNULET
SVP & CHIEF FINANCIAL OFFICER

**ACCEPTED AND AGREED**:

**CARACOL TELEVISION S.A.**

cc:    Mr. Marcos Santana (*Marcos.Santana@nbcuni.com*)
       Mr. Joshua Mintz (*Joshua.Mintz@nbcuni.com*)

Mr. Felipe Boshell
August 27, 2013
Page 3

## Annex A

## TERM SHEET

| 1. Parties: | a. Caracol Televisión S.A. ("Caracol")<br>b. Telemundo Television Studios, LLC ("TTS")<br>c. Telemundo Internacional, LLC ("TI") |
|---|---|
| 2. Date: | As of August 27, 2013 |
| 3. Sequel: | a. TTS will develop, produce, own, and distribute a sequel to the "El Señor de los Cielos" (the "Series") for the exhibition and exploitation in the United States, its territories, as well as throughout the world (the "Sequel").<br><br>b. The Sequel will be based on the original format of the Series, which TTS shall have all right to use all elements (e.g., characters, story, scenarios, locales, etc.) derived from the Series and any new elements added by TTS for purposes of creating the Sequel. For clarity, TTS will not be entitled to use images and content licensed by Caracol for the Series, except as agreed mutually by the Parties in a case-by-case scenario. |
| 4. Number of Episodes; Length: | The Sequel shall consist of approximately sixty (60) episodes of approximately forty-two (42) minutes in length. |
| 5. Production: | TTS shall have the exclusive right to produce and exploit the Sequel, which Caracol shall have certain exhibition rights as granted herein. |
| 6. Development & Control of the Sequel: | TTS shall have exclusive creative decisions, development of budgets and casting, among other matters in the development and production of the Sequel. |
| 7. Ownership: | From inception through all stages of completion, the Sequel and all elements thereof, including the underlying works, format and scripts of the Series, will be exclusively owned by TTS throughout the world.<br><br>TTS will own and control all exclusive, irrevocable and perpetual right, title and interest (including copyright), throughout the universe in and to the Sequel and all derivatives of the Sequel, and all elements, underlying works or portions thereof, including all raw footage, from the inception of production, in any and all media and formats, now known or hereafter devised, in perpetuity, including without limitation all literary, dramatic, or other material contained |



Mr. Felipe Boshell
August 27, 2013
Page 4

| | |
|---|---|
| | therein, and the results and proceeds of the services in connection therewith. |
| 8. Reserved Rights: | All and any rights not granted expressly herein to Caracol shall be expressly reserved by TTS. |
| 9. License: | During the Term, TTS grants to Caracol a limited exclusive license to exhibit the Series in Colombia, and the name, logos and related trademarks in connection with the Sequel and promotion thereof. |
| 10. Caracol Exhibition License: | a) Territory: Colombia (the "Territory").<br><br>b) Term: Caracol shall have the right to run the Sequel as specified herein for a period of three (3) years in the Territory free of any license fee payment due to TTS.<br><br>c) Runs: Three (3) runs. Caracol will pay any applicable re-run, residual or other re-use or transmission payments (including any applicable payments related to the employment of non-union actors or the "buy-out" of applicable residuals as may be required for the use of the Sequel in Colombia). If, after the expiration of the exhibition term, Caracol is interested in additional exhibitions of the Sequel in the Territory, Caracol and Telemundo will negotiate in good faith the applicable terms thereof.<br><br>d) Exclusive Media: Caracol shall have the exclusive exhibition license to the Sequel over free-tv over-the-air broadcast in the Territory.<br><br>e) Non-exclusive Media: Caracol shall have the non-exclusive exhibition license to the Sequel over pay-tv in the Territory.<br><br>f) Excluded Media: All digital platforms, including SVOD, download to own, electronic sell through, home entertainment and any allied and ancillary rights related to the Sequel ("Ancillary Rights'). Notwithstanding the foregoing, TTS shall grant (i) a catch-up period of one week to air the Sequel on Caracol's digital internet channel and (ii) a non-exclusive license to Caracol for SVOD on its current SVOD platform, provided such rights are available after production of the Sequel.<br><br>g) Authorized Language: Spanish language only.<br><br>h) Sublicensing: Caracol may not sublicense the exhibition rights granted by TTS to any third party. |



Mr. Felipe Boshell
August 27, 2013
Page 5

| | |
|---|---|
| 11. Caracol International Profit Participation: | TTS shall pay Caracol a foreign participation equal to 15% of 100% of Foreign Net Sales (as defined below) after recoupment of the Production Budget. TI shall provide Caracol with a participation statement with respect payments due to Caracol on a quarterly basis (no later than 30 days following each such quarter). |
| | "**Foreign Net Sales**" shall mean all gross amounts actually received by and/or credited to TI in connection with the exploitation of the Sequel throughout the Participation Territory, *less* only (i) the Distribution Fee (as defined below), (ii) TTS's actual, out-of-pocket third party costs and expenses in connection with the exploitation of the Sequel throughout the Participation Territory, and (iii) any third party participation attributable to the exploitation of the Sequel throughout the Participation Territory. |
| | "**Distribution Fee**" means a 25% distributor fee, *less* distribution fees and expenses, marketing, advertising and promotional expenses, and any applicable taxes. |
| | "**Excluded Territory**" means the exploitation of the Sequel throughout the United States, its possessions and territories and the Telemundo and Telemundo Internacional branded and/or affiliated channels throughout the world, including Mun2. Notwithstanding the foregoing, Mexico shall not be considered an Excluded Territory. |
| | "**Participation Territory**" means on a worldwide basis excluding the Excluded Territory. |
| | "**Production Budget**" means all costs and expenses associated with the below-the-line and above-the-line production and delivery elements associated, directly or indirectly, with the Sequel. |
| 12.   Governing Law: | This Term Sheet shall be in all respects governed by and construed in accordance with the laws of the State of Florida. |
| 13.   Confidentiality: | Any information supplied by either party to the other shall be deemed proprietary and shall be treated as strictly confidential by the receiving party. Except as may be required by law or pursuant to subpoena or order of any judicial, legislative, executive, regulatory or administrative body, the receiving party shall not copy or disclose such information to a third party, except as is necessary to implement this Term Sheet or as may be approved in writing by the other party, or as may be in the public domain through no fault of the receiving party. |

