UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:18-cv-23443-GAYLES

**CARACOL TELEVISION, S.A.**

    Plaintiff,

v.

**TELEMUNDO TELEVISION STUDIOS, LLC., TELEMUNDO INTERNACIONAL LLC, and TELEMUNDO NETWORK GROUP LLC**,

    Defendants.

_____/

### DECLARATION OF MELANIE MONTENEGRO IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT I

I, Melanie Montenegro, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of eighteen and competent to make this Declaration. Unless otherwise indicated, I have personal knowledge of each of the facts stated below.

2. From April 2013, until January 2019, I was employed as Vice President, Business & Legal Affairs, of Telemundo Media, LLC. In this position, I often acted as a business and legal representative of affiliated entities including Telemundo Television Studios, LLC ("TTS"), Telemundo Internacional, LLC ("TI"), and Telemundo Network Group, LLC ("TNG"). I will collectively refer to TTS, TI, and TNG as "Telemundo." My understanding of events occurring before my employment with Telemundo is based on my review of Telemundo's business records kept in the ordinary course of business.

3. Before my employment with TTS,

    a) TTS entered into a Co-Production Agreement dated October 25, 2012 (the "Co-Production Agreement") with a Colombian company named Caracol Television, S.A. ("Caracol" or "Plaintiff") to co-produce a television program entitled *El Señor de los Cielos* (the "Series"); and

    b) TI entered into an International Distribution Agreement with Caracol dated October 25, 2012 ("Distribution Agreement") related to the Series.

4. Production of the first season of the Series began on or about January 14, 2013, and the total production costs for the first season of the Series exceeded approximately $12 million. Under the terms of the Co-Production Agreement, Telemundo and Caracol had agreed to split the total production costs for the first season of the Series evenly, although Telemundo ultimately paid

greater than half of the total production costs. Accordingly, I understand that Caracol's share of the production costs for the first season of the Series was approximately in excess of $6 million.

5. On or about April 15, 2013, TNG began airing the first season of the Series on television in the United States. From the very first episode, the Series featured a character called Milton Jiménez or "El Cabo" (the "El Cabo character").

6. Also in or about May or June of 2013, TTS began discussions with Caracol regarding producing a second season, and subsequent seasons, of the Series. Pursuant to Section 5(b) of the Co-Production Agreement, TTS offered Caracol the opportunity to continue to co-produce the Series with TTS. After a period of negotiation, Caracol decided not to participate as a co-producer in the Series with TTS for the subsequent seasons.

7. Caracol advised Telemundo that there were various reasons why Caracol chose not to continue co-producing the subsequent seasons of the Series with TTS. Among those reasons, as communicated to me by Caracol's representative, Mr. Felipe Boshell, were the following:

    i) Caracol had not yet begun airing the Series in Colombia, its primary territory provided under the Co-Production Agreement, and thus did not want to participate and make the investments of substantial sums in subsequent seasons of the Series when they did not know how the first season would be received in Colombia;

    ii) TNG had only just begun airing the Series in the U.S., and thus, at that time, there was also very limited information on the Series' popularity and ratings;

    iii) Caracol had a concern that the government agency in Colombia responsible for monitoring and censoring media outlets had not yet advised Caracol whether any portions of the Series might be censored in Colombia, and Caracol was concerned about censorship and regulatory approval there (which is generally more restrictive than in the U.S.) because of the violent plot elements of the Series related to drug trafficking and organized crime;

    iv) Caracol had already invested millions of dollars as its share of the co-production costs for Season 1 of the Series, under the Co-Production Agreement, had not yet recouped any of its investment, and was unwilling to invest what was projected to require at least the same amount, and likely more, to produce Season 2 and subsequent seasons;

    v) The amount of the license fee Telemundo originally proposed to Caracol, to allow Caracol to broadcast the second season of the Series in Colombia, was based on the license fee Caracol and Telemundo had negotiated for another *telenovela* named *La Reina del Sur*, and Caracol did not want to pay

a comparable license fee, and so was looking for a deal in which it could avoid paying that same license fee, which factored into the proposal the parties ultimately agreed upon in the Letter Agreement, in which Caracol got a free license to broadcast the second season of the Series in Colombia.

8. Instead, Caracol and TTS agreed on the following bargain: TTS would produce the second season and subsequent seasons of the Series on its own, thereby incurring 100% of all costs of production, and would give Caracol a free license to exhibit the second season of the Series in Colombia, and a percentage of foreign licensing revenue. In exchange, TTS would own all of the intellectual property rights in the Series, including Season 1 and all subsequent seasons, and control all creative decisions going forward. This agreement allowed Caracol to benefit from TTS's continued production, financing, marketing and distribution efforts without incurring any additional distribution risk or production costs.

9. This agreement was memorialized in a Letter Agreement that is dated, on its face, August 27, 2013, which was signed by TTS and Caracol (the "Letter Agreement") (attached hereto as Exhibit "A"). The Letter Agreement was negotiated, finalized and executed over the course of approximately three months in the summer of 2013, with negotiations commencing on or about June 18, 2013, and ending with Telemundo's receipt of the fully executed Letter Agreement from Caracol on or about September 11, 2013.

10. I was the point person and lead drafter and negotiator of the Letter Agreement on behalf of Telemundo. Mr. Felipe Boshell, the General Manager of Caracol at that time, was the primary negotiator and point person on behalf of Caracol. The key points of our negotiations and communications leading up to the execution of the Letter Agreement can be summarized as follows.

11. On or about June 18, 2013, I drafted and sent an introductory email to Mr. Boshell, a true and correct copy of which is annexed hereto as Exhibit "B" (with a certified English translation annexed thereto as Exhibit "B-1") (the "June 18th Email").

12. In the June 18th Email, I introduced myself to Mr. Boshell and summarized the general terms of the bargain that Telemundo was proposing to Caracol to formally amend the terms of the Co-Production Agreement to govern the second season of the Series, and also specifically to govern "all subsequent," or "successive," seasons of the Series if any were to be produced. The June 18th Email reflected the general understanding of both Telemundo and Caracol, as had been discussed between the parties, that Caracol had no desire to participate as a co-producer in the

3

production of the Series for the second season or for any subsequent seasons, for at least those reasons set forth in the preceding paragraphs.

13. Accordingly, the June 18th Email generally memorialized some of the key business terms proposed by Telemundo, which terms did not change throughout the course of the negotiations, and which were ultimately reflected in the final, executed Letter Agreement: Telemundo would produce the subsequent seasons of the Series on its own, incurring all production costs itself; Telemundo would get all rights to exploit the Series and "all subsequent seasons" going forward; and in exchange Telemundo would give Caracol a free license to exhibit the subsequent seasons of the Series in Colombia, and a percentage of foreign licensing revenue.

14. Indeed, the final, executed Letter Agreement specifically refers to this June 18th Email in the opening paragraph of the cover letter that comprises the first page of the Letter Agreement. (*See*, Exh. "A" hereto, at 1, ¶1) ("… *as communicated to you via e-mail on June 18, 2013* and consistent with the provisions more fully described in the Term Sheet (the 'Term Sheet') attached hereto as Annex A") (emphasis added).

15. At the time of sending the June 18th Email to Caracol, and at all times through the course of the negotiations leading up to the execution of the Letter Agreement in September, 2013, it was clearly understood by Telemundo, and by Caracol, as communicated by me directly to Mr. Boshell on numerous occasions, and confirmed each time by Mr. Boshell, that the parties' intent was that Telemundo would own all of the intellectual property rights, including all copyrights, associated with the Series, the second season or "sequel" to the first season, and all subsequent seasons of the Series. I clearly communicated this intent to Mr. Boshell and Mr. Boshell clearly communicated to me that he and Caracol agreed and understood that this was the intent and purpose of the Letter Agreement. Indeed, Telemundo would never have agreed to give Caracol a free license to broadcast the second season of the Series in Colombia, which Telemundo valued at several million dollars, without an agreement that Telemundo would own and control all of the rights to the Series.

16. Mr. Boshell initially responded to the June 18th Email on June 28, 2013, by only raising two business terms that Caracol was concerned about: (1) Caracol wanted to enlarge the time period for which they would have the free license to broadcast each season of the Series in Colombia to three years; and (2) Caracol wanted a 15% revenue share for all international sales of the Series.

17. Thereafter, I began drafting the Letter Agreement, which consisted of a two-page cover letter with signature blocks for the parties' representatives, with an "Annex A" entitled "TERM SHEET" attached to the cover letter. Because the purpose and intent of the Letter Agreement was to amend the terms of the Co-Production Agreement, in the course of preparing the Letter Agreement I reviewed the key language of the Co-Production Agreement, in particular the language of Paragraph 5 of that agreement regarding copyright ownership, remakes, spinoffs and sequels, and I referenced that language of the Co-Production Agreement and generally sought to track that language for consistency as between the two documents.

18. On or about July 9, 2013, I sent Mr. Boshell the first draft of the Letter Agreement, which is dated July 9, 2013, a true and correct copy of which is attached hereto as Exhibit "C" (with a certified English translation annexed thereto as Exhibit "C-1").

19. On or about July 22, 2013, Mr. Boshell emailed me a revised draft of the Letter Agreement, a true and correct copy of which is annexed hereto as Exhibit "D" (with a certified English translation annexed thereto as Exhibit "D-1"). This revised draft version included some proposed edits to Sections 3 and 10 of the Term Sheet in the draft version I had previously sent to him, as reflected in the attached. The revisions proposed to Section 10 of the Term Sheet were intended to increase Caracol's share of the international profit participation on foreign licenses of the Series.

20. As for the revision Mr. Boshell proposed to Section 3(b) of the Term Sheet, Mr. Boshell proposed inserting the following language at the end of Section 3(b): "For clarity, TTS will not be entitled to use images and content licensed by Caracol for the Series, except as agreed mutually by the Parties in a case-by-case scenario." I specifically discussed this proposed language with Mr. Boshell. In the course of these discussions, I clarified the intent and purpose of this new language with Mr. Boshell, and made it perfectly clear that Telemundo would not enter into this Letter Agreement if Caracol was to have any control or rights over any creative decisions or content of the Series. Mr. Boshell clearly explained that this new language was only intended to cover and apply to any content that Caracol had licensed from some third party, and that therefore that Caracol did not own, that might have been used in the first season of the Series. In explaining his purpose for wanting to add this provision, Mr. Boshell specifically said to me words to the effect that "I can't give you what I don't own," meaning that Caracol could not give Telemundo rights that it does not own or that it had previously licensed from another party. I told Mr. Boshell

5

that Telemundo understood and agreed that Caracol could not agree to assign or license any rights that it did not necessarily own, and that therefore this language could remain in the document. In these discussions, however, I made it perfectly clear to Mr. Boshell that "we are not coming back to you for anything," meaning that Telemundo would not agree that they ever had to come back and seek any approvals or permissions of any kind whatsoever going forward with any production of the second season or any subsequent seasons, because Telemundo would own all rights to the Series going forward. I specifically remember explaining this point to Mr. Boshell, in both Spanish and in English, and specifically remember that Mr. Boshell indicated to me that he fully understood and agreed with my point. Mr. Boshell clearly indicated that he understood that this was the intent of the Letter Agreement and that Caracol agreed with such intent.

21. After these discussions with Mr. Boshell and internal discussions at Telemundo, I made further revisions to the Letter Agreement in an effort to ensure that it accurately reflected the parties' intent and understanding. Accordingly, on or about August 6, 2013, I emailed Mr. Boshell a revised draft of the Letter Agreement, a true and correct copy of which is annexed hereto as Exhibit "E." In making the revisions to Sections 7 and 8 of the Term Sheet, I wanted to make sure that, in light of my discussions with Mr. Boshell related to Section 3, the Letter Agreement was perfectly clear that Telemundo would own and control all of the rights to the Series, specifically including all rights to the underlying scripts, or "formats" of the Series, with the sole exception being limited to any third-party images and content that Caracol had previously licensed and to which it could not grant us the rights to, as set forth in the new language added to 3(b). Accordingly, I revised Section 7 ("Ownership") of the Term Sheet to specifically indicate that Telemundo would own all rights to all underlying format and scripts of the Series, which included the script or format to season 1 of the Series.

22. To further ensure that the Letter Agreement clearly indicated that Telemundo would own all rights to the Series (with the limited exception of third-party content previously licensed by Caracol as referenced in Section 3(b)), I revised Section 8 of the Term Sheet and renamed it "Reserved Rights," as follows: "All and any rights not granted expressly herein to Caracol shall be expressly reserved by Telemundo." The purpose and intent of this revised Section 8 was to ensure that the Letter Agreement clearly reflected that Telemundo would own and control all rights to the Series, including all copyrights, with the only exception being any rights expressly granted to Caracol in the body of the Letter Agreement. In other words, Section 8 was intended to resolve

6

any doubts or dispute about the ownership of any rights under the Letter Agreement and the Co-Production Agreement in favor of Telemundo, unless the Letter Agreement contained an express provision that granted some limited rights to Caracol. In my discussions with Mr. Boshell regarding this provision, he clearly indicated to me that he understood and agreed with that position.

23. After I had sent Mr. Boshell the August 6, 2013, version of the Letter Agreement annexed hereto as Exhibit "E," my understanding is that the issue of the ownership of the rights to the Series and to all subsequent seasons of the Series was fully resolved, understood and agreed upon, and we had no further negotiations or discussions over Sections 3, 7 or 8 of the Term Sheet.

24. We did, however, continue to negotiate further on the financial terms of the Letter Agreement, in particular Section 11 of the Term Sheet "International Profit Participation," and on the terms relating to Caracol's broadcast rights in Colombia, as referenced in Section 10. In the course of those remaining discussions, in August of 2013, Mr. Boshell and I exchanged further drafts which contained substantive edits and revisions only to Sections 10 and 11 of the Term Sheet. True and correct copies of these revised drafts exchanged by the parties in mid- to late August, 2013 are annexed hereto as Composite Exhibit "F" (with certified English translations annexed thereto as Exhibit "F-1")

25. Ultimately, by late August, 2013, Telemundo and Caracol had completed their negotiations on the draft Letter Agreement, and I sent what would turn out to be the final version of the Letter Agreement to Mr. Boshell on or about August 27, 2013.

26. I signed the Letter Agreement at page two on behalf of TTS, together with Javier Maynulet, then an executive of TTS, and sent that version of the document to Mr. Boshell for counter-execution by Caracol. Mr. Boshell had the Letter Agreement executed, including having initialed each page of the document, on behalf of Caracol, and returned the fully executed document to me by email on September 11, 2013. See Exh. "G" hereto.

27. My statements in this Declaration regarding the agreements reflect my understanding of the intent of all parties to the Letter Agreement at the time it was executed, as communicated to me by Caracol's representative and discussed in multiple telephone conversations with Caracol's representative in the course of negotiating the Letter Agreement from June through September, 2013. As further detailed below, the Letter Agreement specifically was intended to and did amend the prior Co-Production Agreement, particularly as to the use and

ownership of intellectual property rights related to the Series, subsequent seasons of the Series, and all other derivative works related to the Series.

28. Section 3 of the Letter Agreement's Term Sheet provides: "TTS shall have all right to use all elements (e.g., characters, story, scenarios, locales, etc.) derived from the Series and any new elements added by TTS for purposes of creating the Sequel." This language authorized TTS to use all existing elements, including "characters, story, scenarios, locales, etc." of the Series, which at that time included a single season of seventy-four (74) episodes, to create the second season of the Series as well as all subsequent seasons or other derivative works. As discussed above, the elements of the Series existing at the time of the Letter Agreement included the El Cabo character and the Oscar Cadena character who were part of the Series.

29. Section 7 of the Letter Agreement's Term Sheet, titled "Ownership," states (emphasis added): "From inception through all stages of completion, the Sequel and all elements thereof, *including the underlying works, format and scripts of the Series*, will be **exclusively owned** by TTS throughout the world." This language amended similar "Ownership" language included in Section 5(a) of the Co-Production agreement such that TTS would **exclusively own** all intellectual property rights (including copyrights) to both the second season of the Series "and all elements thereof, including the underlying works, format and scripts of the Series." In accordance with this language, the El Cabo and Oscar Cadena characters, as embodied in the second season and the "underlying works, format and scripts" of the first season were to be "exclusively owned by TTS throughout the world." Thus, going forward TTS "exclusively owned" the El Cabo and Oscar Cadena characters and had the exclusive right to use them in derivative works including all subsequent seasons of the Series.

30. The next portion of Section 7 further confirms this fact and states: "TTS will *own and control* all exclusive, irrevocable and perpetual right, title and interest (*including copyright*), throughout the universe in and to the Sequel and all derivatives of the Sequel, and all elements, *underlying works* or portions thereof …." (emphasis added). In my discussions and negotiations with Mr. Boshell, it was clear that all parties understood that Season 1 of the Series was, obviously, one of the "underlying works" from which the second season and all subsequent seasons of the Series would be based. Accordingly, at all times in the course of negotiating the Letter Agreement it was clearly understood and communicated this language of Section 7 of the Term Sheet was

intended to make clear that TTS would exclusively "own and control" all intellectual property rights, specifically including the copyright, to Season 1 of the Series.

31.     Thus, Telemundo proceeded to produce and distribute further seasons of the Series bearing the entire cost of production for each of the successive seasons, totaling in the tens of millions.  Production of the second season of the Series began on or about November 18, 2013.  On or about May 26, 2014, TNG began airing the second season of the Series on television in the United States.

32.     On September 30, 2014, TI and Caracol entered into a Volume License Agreement (the "2014 Volume Agreement") providing general terms under which Caracol would purchase rights to exhibit TTS television programs in Colombia, a true and correct copy of which is annexed hereto as Exhibit "H," (together with a certified English translation annexed as Exhibit "H-1").  I reviewed and signed the 2014 Volume Agreement on behalf of TI.  The 2014 Volume Agreement expressly indicates that TI owns and controls all rights to the Programs licensed thereunder and granted Caracol a strictly limited license of TI's copyright rights. *See, e.g.*, Exh. H-1, at 8, ¶2 ("**LICENSE**: Telemundo hereby grants, and the Licensee accepts, a limited license under copyright to Broadcast each Program in the Territory during the Effective Term hereof, in the Media, as agreed under the special terms. The Licensee hereby states and acknowledges that the scope of its rights to the Programs is only as licensed hereunder. Accordingly, the Licensee has no rights to the name, trademark or any other item appearing therein or related thereto, nor to any other chapter or subsequent translation thereof or sequel thereto, relating to the plot, characters, and the like.").

33.     At no time during the negotiation of the 2014 Volume Agreement did anyone with Caracol raise any issues with Telemundo's inclusion of the El Cabo character, or the Oscar Cadena character, in the second season of the Series.

34.     On or about January 14, 2015, TTS began production of the third season of the Series.  Caracol was fully aware that TTS was moving forward with producing further seasons of the Series committing to substantial production costs in the millions of dollars.

35.     It was not until February 2015, that Caracol communicated to Telemundo for the first time its conflicting interpretation of the Letter Agreement.  On March 30, 2015, I received the first correspondence from Caracol's attorney of record in this case, David M. Rogero.

9

36. Telemundo continued to produce and distribute additional seasons of the Series, including the El Cabo and Oscar Cadena characters, and Caracol continued to order rights to exhibit them in Colombia under the 2014 Volume Agreement (which expired on Dec. 31, 2016), and a subsequent "Volume Deal" dated January 1, 2017 (expiring Dec. 31, 2019) (the "2017 Volume Deal"), a true and correct copy of which is annexed hereto as Composite Exhibit "I" (Collectively, the 2014 Volume Agreement and the 2017 Volume Deal shall be referred to as the "Volume Deals").  The language of the 2017 Volume Deal also expressly provides that TI owns and controls all rights to the Programs licensed thereunder, and that any rights not expressly granted therein are reserved to TI.  (*See*, *e.g.*, Exh. I hereto, Volume Deal dated January 1, 2017, at ¶1(a) (Telemundo grants Caracol rights *to license* the Programs in Telemundo's catalogue); at ¶2(f) (Telemundo grants Caracol the right *to exhibit* the Programs); at ¶2(g) ("[Telemundo] *reserves all rights not expressly granted herein* (whether known or unknown) in and to each Selected Program licensed hereunder and its contents."); and, at Exh. A, "Standard Terms & Conditions," ¶13 (Telemundo represents that it *holds all necessary title* in order to License the Programs to Caracol) (emphasis added).  Caracol has never sought to amend or modify any of the language of the Volume Deals reflecting Telemundo's sole and exclusive ownership rights in and to the subsequent seasons of the Series.

37. Attached hereto as Exhibit "J," are true and correct copies of "Start Orders" or "Purchase Orders" (*Orden de Compra*) by which Caracol continued to license from Telemundo each of the subsequent seasons of the Series, including Seasons 3, 4 and 5, for broadcast in Colombia, at a cost to Caracol of several hundred thousand U.S. dollars for each season.  The table below summarizes the details for each of the Orders that Caracol placed with Telemundo for each of the subsequent seasons of the Series.  The Start Orders explicitly "incorporate[] by reference" the terms and conditions of the Volume Deals and/or are expressly "subject to the terms and conditions." *See, e.g.*, Composite Exhibit "J," and "J-1" (translation), at first paragraph of Start Order No. 16-150 ("subject to" Volume Deal); and at, second paragraph of Start Order 16-374, Start Order 17-203 and Start Order 120112-0 ("incorporates by reference" and "subject to" Volume Deal).

38. The table below summarizes the executed Start Orders Caracol has placed with Telemundo over the past several years, pursuant to the applicable Volume Deals, to license each Season of *El Señor de los Cielos* from Telemundo.

| Date | Description | *El Señor de los Cielos* Season |
|---|---|---|
| 6/16/2016 | Start Order No. 16-150 | III |
| 1/1/2017 | Start Order No. 16-374 | IV |
| 7/27/2017 | Start Order No. 17-203 | V |
| 3/2/2018 | Start Order No. 120112-0 | VI |
| 8/21/2018 | Amendment to Start Order No. 120112-0 | VI |
| 10/29/2018 | Second Amendment to Start Order No. 120112-0 | VI |

39. At no time during the negotiation or performance of the Volume Deals, nor during the negotiation, execution or performance of the terms and conditions of the Start Orders, did Caracol ever attempt to revise or object to the language in any of the Volume Deals or the Start Orders that makes clear that Telemundo owns and controls all rights to those Programs, including the Series, nor make any mention that it claimed that it owned any rights whatsoever to any particular characters, or any other elements, of the Series.

40. It was not until after the production of Season 6 of the Series that Caracol first made any mention whatsoever of its new claim that it somehow owned some rights to the El Cabo character. Telemundo immediately rejected this claim based on the plain language of the Letter Agreement and also based on the long course of dealing between the parties in which Caracol at all times conducted itself in accordance with the parties' mutual understanding, that Telemundo owned and controlled all rights to all elements of the Series and to all derivative works based on the Series.

41. I participated in the negotiation of the Volume Deals on behalf of TI. At no time during the course of the negotiations of the Volume Deals did anyone with Caracol raise any issues with Telemundo's inclusion of the El Cabo or Oscar Cadena characters, or any other elements, in later seasons of the Series. Nowhere in the Volume Deals is any dispute over ownership over the Series or the El Cabo character even mentioned. As detailed below, Caracol continued to order subsequent seasons of the Series pursuant to the terms of the Volume Deals.

42. The below table summarizes Telemundo's production and distribution of seasons three through six of the Series in the United States and Caracol's Orders to exhibit same in Colombia pursuant to the Volume Deals:

| Season | Production Began (on or about) | Production Ended (on or about) | First Aired in U.S. (on or about) | Season End in U.S. (on or about) | Ordered by Caracol |
|---|---|---|---|---|---|
| III | 01/14/15 | 11/26/15 | 04/21/15 | 09/21/15 | 06/16/16 |
| IV | 01/14/15 | 11/26/15 | 03/28/16 | 07/18/16 | 01/0117 |
| V | 04/03/17 | 08/27/17 | 06/20/17 | 11/02/17 | 07/27/17 |
| VI | 03/05/18 | 08/29/18 | 05/08/18 | 09/24/18 | 03/02/18 |
| VII | 05/27/19 | TBD | TBD | TBD | TBD |

43. Since 2012, Telemundo has also developed relationships and worked with numerous other distributors, licensees, and other companies to promote, advertise, distribute, and monetize the Series in more than 22 countries.

44. At no time during the six (6) years prior to the filing of this lawsuit did anybody at Caracol demand that Telemundo stop producing or distributing the Series. Caracol's prior demands have amounted to requests for additional revenue for the exploitation of the Series. At no time, did Caracol offer to produce, co-produce, or share in the production costs of any seasons or episodes of the Series.

45. Telemundo has to date spent a total that amounts to tens of millions of dollars in production costs to produce Seasons 2, 3, 4, 5, 6, and 7. Because Caracol agreed in the Letter Agreement that it would no longer split production costs, and indeed would have no obligation at all for those costs for Season 2 or any subsequent seasons, Caracol has in effect saved itself tens of millions of dollars in production costs by entering into the Letter Agreement. Telemundo agreed in the Letter Agreement to bear 100% of the risks of investing millions of dollars in subsequent seasons of the Series, and would only do so if, going forward, it would be able to reap the full benefits if the Series turned out to be profitable. Telemundo would never have agreed to pay 100% of the production costs for Season 2, and for all subsequent seasons of the Series, unless it had an agreement that gave it full control and ownership of all rights in and to the Series. By now claiming some ownership rights in the Series, Caracol is in effect attempting to re-negotiate the deal it struck in the summer of 2013, with the benefit of hindsight in light of the high ratings, popularity and financial success that the Series had ultimately turned out to be.

46. Over the years this dispute has dragged on, Caracol has repeatedly attempted to change its position on many points related to the Letter Agreement. For example, Caracol never made any claim of any rights to any particular character, or other element of the Series, until after production of Season 6 of the Series. Even upon the filing of this lawsuit in August, 2018, the only character that Caracol claimed any rights in was El Cabo. Then, months after it had sought a

preliminary injunction related solely to the El Cabo character (which it ultimately lost), Caracol changed its position again and for the first time ever, raised a new claim to rights to yet another character, named Oscar Cadenas. Accordingly, Caracol's claim to rights to Oscar Cadena was made for the first time almost seven years after the parties entered into the Co-Production Agreement in 2012, six years after the parties entered into the Letter Agreement, amending the Co-Production, in 2013, seven months after filing this lawsuit, and six months after seeking a preliminary injunction in this action related to rights to only one character (El Cabo).

47. In conclusion, as the lead negotiator of, and a signatory to, the Letter Agreement on behalf of Telemundo, there is no doubt in my mind that the intent of the parties in negotiating and executing the Letter Agreement was to enter into a transaction, as described in more detail above, whereby Telemundo would own (with the very limited exception noted above) all intellectual property rights and all copyrights in and to the Series, *El Senor de los Cielos*. In the course of my discussions and negotiations with Caracol leading up to the execution of the Letter Agreement, it was clear that Caracol also understood that this was the intent and purpose of the Letter Agreement.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated: August 22, 2019.

_____
MELANIE MONTENEGRO