UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:18-cv-23443-GAYLES

**CARACOL TELEVISION, S.A.,**

      Plaintiff,

vs.

**TELEMUNDO TELEVISION STUDIOS,
LLC., TELEMUNDO INTERNACIONAL
LLC, AND TELEMUNDO NETWORK
GROUP LLC,**

      Defendants.

&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;/

**PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT
AS TO COUNT I OF THE AMENDED COMPLAINT
AND REQUEST FOR HEARING**

Plaintiff Caracol Television, S.A. moves this Court pursuant to Rule 56, Federal Rules of Civil Procedure, for entry of summary judgment against defendant Telemundo Television Studios, LLC., (referred to herein as "Telemundo"), on Caracol's action for declaratory relief stated in Count I of the Amended Complaint (D.E. 7).

Count I seeks relief from this Court in the form of a declaration that Caracol did not assign to Telemundo Caracol's one-half share of the copyright in Season 1 of the telenovela titled *El Señor de los Cielos*, and that, as a result, Caracol and Telemundo continue as joint owners of the copyright in the first season of *El Señor de los Cielos*. Caracol asserts that there are no genuine issues of material fact and it is entitled to judgment as a matter of law.

Caracol filed a similar motion on July 12, 2019 (DE 57). On February 7, 2020, this Court entered an order denying the motion without prejudice, stating, "The Court finds that the issues raised in the Motion are best resolved after the close of discovery." (DE 73). Discovery has concluded, and Caracol renews its motion for summary judgment.

Uncontroverted Facts[1]

This action arises from a series of business transactions between Bogota-based Caracol and Miami-based Telemundo, beginning in October 2012, for the co-production of a telenovela titled *El Señor de los Cielos*. In the parties' Co-Production Agreement [DE 7, pp. 18-29] entered in 2012, the parties agreed to share in funding the production of a program consisting of 60 to 75 episodes and agreed that the parties would own the copyright in the program (called the "Series") jointly. In the Co-Production Agreement, the parties anticipated that the success of the program to be produced might encourage the production of sequels or other derivative works. Thus, the parties agreed that if either of the joint owners desired to produce a sequel, a spin-off, or other "Derived Series," the interested party had to offer the other party an opportunity to co-produce. The other party was not compelled to co-produce, but could decline the offer. If the other party declined, the parties agreed to negotiate in good faith the terms under which the interested party would be granted the sole right to produce the derivative work. (SMF ¶¶ 5–8). The production of the original Series was completed, and the program first aired in 2013. (SMF ¶¶ 12-13).

Following the agreed procedure, Telemundo approached Caracol in 2013 offering the opportunity to co-produce a sequel to *El Señor de los Cielos*. Caracol declined to co-produce, and the parties negotiated the terms under which Telemundo was granted the right to produce the "Sequel," which became the second season of *El Señor de los Cielos*. Paragraph 5 of the Co-Production Agreement provided minimum terms to be part of the good faith negotiations (SMF ¶ 11). Accordingly, the parties agreed in a Letter Agreement [DE 7, pp. 31-47] dated August 27, 2013, that Caracol would not participate in the production of a second season of *El Señor de los Cielos*, and that Telemundo would produce and own what was termed the "Sequel." (SMF ¶¶ 15-17). The production of the second season of *El Señor de los Cielos* was completed by Telemundo, and the Sequel was first aired by Telemundo in 2014.

In August of 2014, Caracol learned that Telemundo interpreted the provisions of the Letter Agreement to be a complete assignment of Caracol's interest in the original work, the first season of *El Señor de los Cielos*, produced in 2013. As a result of Telemundo's interpretation, Telemundo claims that it owns all of the copyright in *El Señor de los Cielos*. (SMF ¶ 18). Telemundo has since

---

[1] In accordance with Local Rule 56.1, the plaintiff files with this motion a Statement of Material Facts. References to specific uncontroverted facts in the Statement will be designated "SMF" followed by the relevant paragraph number(s).

produced five more seasons of *El Señor de los Cielos*, and has produced a spin-off program titled *El Chema*, all derived from the original, jointly owned program. (SMF ¶¶ 19, 20). Telemundo did not follow the procedure agreed in the Co-Production Agreement in order to obtain the sole right to produce these additional derivative works (SMF ¶¶ 5–8).

Caracol disputes Telemundo's claim and asserts that it is entitled to compensation for Telemundo's breach of the parties' Co-Production Agreement and its derivative use of the parties' joint work. This would include damages in the form of license fees and other compensation Caracol should have received from Telemundo for the later seasons of *El Señor de los Cielos* produced by Telemundo after Season 2 and from Telemundo's spinoff *El Chema*.

This motion for summary judgment addresses only the request for declaratory relief asserted in Count I of the Amended Complaint. The basic question posed by Count I is whether or not the terms of the parties' Letter Agreement operate as a transfer of Caracol's copyright interest in the first season of *El Señor de Los Cielos*.

Argument

1.   Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides for the means to obtain judgment on a claim or defense without trial. Rule 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

This Court has previously provided guidance for the presentation and determination of Rule 56 motions in *Pons v. Latin Motors Int'l, LLC*, 17-CV-22439, 2018 WL 2688797, at *1–2 (S.D. Fla. May 8, 2018), and in *Azze v. Dade Med. Coll., Inc.*, 15-CV-24175, 2017 WL 880426, at *1–2 (S.D. Fla. Mar. 6, 2017).

With this motion, as required by Local Rule 56.1, Caracol is filing a statement of undisputed material facts, supported by references to admitted allegations in pleadings and declarations made under oath.[2] These undisputed facts show that Caracol is entitled to summary judgment

---

[2]  Caracol relies upon the Declaration of Jorge Martinez de Leon, August 23, 2018 [DE 3-1], the Declaration of Jorge Martinez de Leon, July 12, 2019 [DE 57-2] (herein "Martinez II), and the

declaring that no assignment of copyright was made and that Caracol continues as the owner of a one-half interest in the original series titled *El Señor de los Cielos*.

2. <u>Federal Jurisdiction</u>

This action for declaratory relief requires the application of U.S. Copyright Law to determine the issue presented. This Court has exclusive jurisdiction pursuant to 28 U.S.C. 1338(a), which provides in part:

> The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights.

3. <u>Federal Declaratory Action</u>

28 U.S.C. § 2201(a) provides:

> In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.[3]

Caracol presents an actual controversy between the parties over the effect of their Letter Agreement upon the parties' joint ownership of the copyright in Season 1 of *El Señor de los Cielos*.

4. <u>Federal Law of Rights of Co-Owners of Copyright</u>

The authors of a joint work are co-owners of copyright in the work. 17 U.S.C. § 201(a). Among the exclusive rights enjoyed by copyright owners under Section 106 of the Copyright Act, 17 U.S.C. § 106, is the right to prepare or authorize others to prepare derivative works based upon the copyrighted work.

In the absence of an agreement otherwise, a joint owner of a copyright has the right to prepare a derivative work without the permission or authorization of the other owner, owing only a duty to account to the co-owner for any profits realized from the exploitation of the derivative

---

Declaration of Jorge Martinez de Leon, August 12, 2020 (filed with this motion) (herein "Martinez III").

[3] Exceptions described in the statute are not applicable in this case, and are omitted.

work. *Goodman v. Lee*, 78 F.3d 1007, 1012 (5th Cir. 1996); *Oddo v. Ries*, 743 F.2d 630, 632–33 (9th Cir. 1984). Caracol and Telemundo agreed, however, to restrict the right to prepare a derivative work and to require either co-production of derivative works or negotiation of terms permitting one party to produce a derivative work on its own.

The Copyright Act provides guidance on the extent of the ownership of an author of a derivative work. 17 U.S.C. § 103(b) provides:

> The copyright in a … derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

Thus, without some agreement otherwise, Caracol's permission to allow Telemundo to produce the Sequel does not affect the joint ownership of the original Series.

### 5. Federal Copyright Law of Assignments

Title 17, Section 101, U.S. Code, defines a "transfer of copyright ownership" as

> an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

The means of transferring one's ownership of a copyright is controlled by 17 U.S.C. § 204(a), which provides,

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

Thus, compliance with Section 204(a) is required in order for Caracol to have effectively transferred to Telemundo its share of copyright ownership in the original Series, *El Señor de los Cielos*.

"Section 204 ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). While state statutes of frauds serve a purely evidentiary function, "a transfer of copyright is simply 'not valid' without a writing. … Section 204's writing requirement not only protects authors from fraudulent claims, but also 'enhances predictability and

certainty of ownership—'Congress's paramount goal' when it revised the Act in 1976.'" *Id.; Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994).

"The copyright laws do not specify what constitutes a sufficient note or memorandum." *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 936 (N.D. Cal. 1992). "No magic words must be included in a document to satisfy 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright." *Radio Television Espanola S.A. v. New World Ent-m't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999); *Sisyphus Touring, Inc. v. TMZ Productions, Inc.*, 208 F. Supp. 3d 1105, 1112–13 (C.D. Cal. 2016); *Dellacasa, LLC v. John Moriarty & Assocs. of Fla., Inc.*, No. 07-21659-CIV, 2008 WL 299024, at *14 (S.D. Fla. Feb. 1, 2008).

In *Pamfiloff,* the court found Section 204(a) to be analogous to a statute of frauds, which requires a writing that (1) reasonably identifies the subject matter of the agreement, (2) is sufficient to indicate that the parties have come to an agreement, and (3) states with reasonable certainty the essential terms of the agreement.

Following the Ninth Circuit's holding in *Effects Associates, Inc. v. Cohen,* the Court in *Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332 (S.D.N.Y. 2009), stated,

> It is for these reasons that the intention of a copyright owner seeking to transfer an ownership interest must be clear and unequivocal. … Section 204(a) can be satisfied without much difficulty, but a valid writing must nevertheless clearly identify the deal and its basic parameters. … The purpose of the signed writing requirement is to ensure that the copyright owner deliberately transfers its ownership interest and that the owner does so in a way that provides the parties with a clear guide to their rights and responsibilities.

Id. at 314, 342; *accord*, *Woods v. Resnick*, 725 F. Supp. 2d 809, 826 (W.D. Wis. 2010). Again, "the intention of a copyright owner seeking to transfer an ownership interest must be clear and unequivocal." The "terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear." *Papa's–June Music v. McLean*, 921 F.Supp. 1154, 1159 (S.D.N.Y. 1996).

As a corollary to the required clarity and unambiguity, a writing that is not clear or is ambiguous cannot serve as an assignment of copyright.

> … [A]ny ambiguity concerning the alleged transfer must be interpreted in favor of the original copyright holder in order to satisfy the purpose of Section 204(a). According to the Ninth Circuit, Section 204(a) "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyright work to negotiate with the creator to determine precisely what rights are

> being transferred and at what price." *Effects Assocs*., 908 F.2d at 557. Another Judge of this Court has held that any ambiguity in the transfer document must be construed in favor of the original copyright holder in order to avoid such inadvertent transfers. *Cassway v. Chelsea Historic Props*., 1993 WL 64633 (E.D.Pa. Mar. 4, 1993); see also *Tasini v. New York Times Co*., 972 F.Supp. 804, 810 (S.D.N.Y.), *rev'd on other grounds*, 206 F.3d 161 (2d Cir.2000).

*Bieg v. Hovnanian Enterprises, Inc.,* 157 F. Supp. 2d 475, 480 (E.D. Pa. 2001).

Accordingly, if the writing in issue, the Letter Agreement considered here, does not reflect a clear intent by Caracol to transfer its copyright ownership, it cannot operate as such a transfer. Any ambiguity in the document must be construed in favor of Caracol to avoid any less-than-than-clear assignment.

6.     Judicial Interpretation of Contracts

"Under federal common law, where a contract 'is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous, and the Court will construe the contract as a matter of law.'" *Mycko v. M/Y Amarula Sun*, No. 14-62215-CIV, 2015 WL 2384060, at *3 (S.D. Fla. May 19, 2015) (quoting *Foreman v. Exxon, Corp.*, 770 F.2d 490, 496 (5th Cir.1985). Under Florida law "[w]here a contract is clear and unambiguous, it must be enforced pursuant to its plain language... In such a situation, the language itself is the best evidence of the parties' intent, and its plain meaning controls." *Hahamovitch v. Hahamovitch*, 174 So.3d 983, 985 (Fla. 2015). *See also Carretta v. Royal Caribbean Cruises Ltd*., 343 F. Supp. 3d 1300, 1302–03 (S.D. Fla. 2018).

As established above, under Section 204 of the Copyright Act a clear statement of the intent to transfer a copyright is required, and only clear and unambiguous language transferring a copyright will satisfy the strict requirement imposed by the statute. On the other hand, if the agreement is unclear or ambiguous as to the assignment of Caracol's copyright, it is not a transfer and no amount of parol evidence will support a transfer. *Bieg v. Hovnanian Enterprises, Inc., supra*.

7.     The Letter Agreement Is Not an Assignment of Caracol's Copyright

Caracol does not dispute that the copyright in Sequel, that is, the second season of *El Señor de los Cielos* is owned by Telemundo. That is exactly what the Letter Agreement was designed to do, to allow Telemundo to prepare a derivative work, a "Sequel" composed of "approximately sixty (60) episodes … based on the original format of the Series."

On its face, the parties' Letter Agreement does not transfer Caracol's share of the copyright in the original Series to Telemundo. There is no express transfer of Caracol's rights in the Letter

Agreement. Nothing in the wording of the Letter Agreement operates as an "instrument of conveyance." None of the wording evidences a clear and unequivocal intent to transfer Caracol's copyright. On its face, then, the Letter Agreement fails to satisfy the requirements of Section 204(a).

It is clear that the Letter Agreement is concerned only with rights in the "Sequel," the program that became the second season of *El Señor de los Cielos*. The clear intent of the Letter Agreement is to provide Telemundo with permission to produce the second season and to own the copyright in the Sequel, that is, the second season of *El Señor de los Cielos* only. The Agreement does not "reflect a clear and unequivocal intention on the part of the copyright owner to transfer ownership." *See Woods v. Renick, supra.*

The Letter Agreement begins with the statement, "This offer letter is provided to you [Caracol] pursuant to Section 5(b) of the Co-Production Agreement …," which is the agreement governing the parties' co-production the original Series, that is, the first season of "El Señor de los Cielos." The referenced Section 5(b) provides that in the event either party became interested in "creating and/or producing or licensing" a so-called Derived Series in the form of a remake, spinoff or sequel, it would offer the other party an option to co-produce the Derived Series. The provision provides further that if the other party declined to co-produce, then "the Parties shall negotiate in good faith … the terms under which the interested party may be granted sole right to produce the Derived Series." Then the provision goes on to describe minimum terms including payment to the other party of a license fee for the grant to the interested party of the right to make a sole production and a right of first refusal as to exhibition rights in the other party's home territory.

Accordingly, the Letter Agreement follows the procedure outlined in the parties' previous agreement for Telemundo to gain Caracol's permission to produce the Sequel on its own.[4] Specifically, the Letter Agreement provides Telemundo the right to develop and produce a Sequel, provides it with Caracol's permission to use elements of the original series (an obvious necessity in order to produce a sequel), and consents to Telemundo's ownership of the resulting Sequel. This is made clear throughout the annexed Term Sheet which provides, in part:

---

[4] The first paragraph of the Letter Agreement also refers to a June 18, 2013, email confirming that Telemundo had made the requisite offer of co-production, in accordance with the procedures stated in the Co-Production Agreement.

Section 3(a): TTS[5] will develop, produce, own, and distribute a sequel to the "El Senor de los Cielos" (the "Series") for the exhibition and exploitation in the United States, its territories, as well as throughout the world (the "Sequel'").

Section 3(b): The Sequel will be based on the original format of the Series, which TTS shall have all right to use all elements (e.g., characters, story, scenarios, locales, etc.) derived from the Series and any new elements added by TTS for purposes of creating the Sequel.

Section 5: TTS shall have the exclusive right to produce and exploit the Sequel …

Section 6: TTS shall have exclusive creative decisions, development of budgets and casting, among other matters in the development and production of the Sequel.

These grants of rights are superfluous if Caracol had intended the Letter Agreement to transfer of all of its rights in the original Series. Such a transfer would eliminate the need to delineate any the rights granted to Telemundo for its production of the Sequel. If the Letter Agreement were intended to make Telemundo the sole owner of the original Series, it would not need Caracol's permission to use the format, scripts, characters, or any other elements of the original Series in order to prepare the Sequel. Thus, the Letter Agreement, on its face, contradicts an intent to transfer Caracol's ownership.

The Letter Agreement's sole reference to the parties' earlier agreements is the statement that the offer is made pursuant to Section 5(b) of the Co-Production Agreement, acknowledging the obligation to offer a joint production or to negotiate the terms under which Telemundo could produce the Sequel on its own. If the intent of the Letter Agreement was to transfer all of Caracol's copyright ownership to Telemundo, then Telemundo, as the sole owner of the original Series, would no longer owe any obligations to Caracol under the Co-Production Agreement, and compliance with Section 5(b) would be unnecessary. Again, the language of the Letter Agreement contradicts any intent to transfer Caracol's interest in the original Series. Nor does the Letter Agreement attempt to amend the Co-Production Agreement.

Further, the grant of rights to use elements of the original Series, in the plain language of the Term Sheet, applies to the Sequel only, and cannot be construed as permission to produce subsequent sequels and spinoffs without following the parties' agreed procedure. Section 3(b) goes

---

[5] "TTS" refers to Telemundo Television Studios, LLC.

on to acknowledge that the original series contained material specifically licensed by Caracol, and states:

> For clarity, [Telemundo] will not be entitled to use images and content licensed by Caracol for the Series, except as agreed mutually by the Parties in a case-by-case scenario.

This provision is clear on its face and limits Telemundo's ability to use elements from the original Series that were separately owned by Caracol, unless agreed to separately.[6] While authorizing Telemundo to use jointly-owned elements of the original Series, the language of Section 3 makes no change in the parties' joint ownership of the original Series.

The plain language of the Letter Agreement clearly defines the rights of Telemundo in the Sequel. Section 7 of the Term Sheet, titled "Ownership," makes it clear that Telemundo is to own the Sequel that it will produce. The first paragraph states,

> From inception through all stages of completion, the Sequel and all elements thereof, including the underlying works, format and scripts of the Series, will be exclusively owned by TTS throughout the world.

This provision makes it clear that Telemundo owns the Sequel and all of its elements including those elements derived from the Series. Contrary to Telemundo's assertion that this provision gives it ownership of all elements of the original series, it is clear that that this provision only establishes Telemundo's ownership of the Sequel, free of any claim of ownership by Caracol based upon the use of elements contained in the original Series. An interpretation of this clause as a surrender of all of Caracol's copyright ownership in the original Series not only defies logic, but fails as a clear and unequivocal transfer of rights as required under §204 of the Copyright Act.

In the sole reference to copyright in the Letter Agreement, Section 7 goes on to emphasize Telemundo's ownership of the Sequel:

> TTS will own and control all exclusive, irrevocable and perpetual right, title and interest (including copyright), throughout the universe in and to the Sequel and all derivatives of the Sequel, and all elements, underlying works or portions thereof, including all raw footage, from the inception of production, in any and all media and formats, now known or hereafter devised, in perpetuity, including without

---

[6] While Telemundo has asserted that this provision refers to material owned by third parties which had been licensed to Caracol for use in the original Series, Caracol would not have the ability to reach a mutual agreement with Telemundo for its use. Thus, the language, "except as agreed mutually by the Parties" could not be applied to third-party materials, and Telemundo's interpretation is erroneous and misleading.

> limitation all literary, dramatic, or other material contained therein, and the results and proceeds of the services in connection therewith.

Again, the Letter Agreement makes it clear that Telemundo owns the Sequel and all its elements. As the owner of the copyright in the Sequel, Telemundo enjoys the rights provided under 17 U.S.C. § 106, including the right to prepare derivative works based upon the Sequel. But that right would not displace Telemundo's contractual obligation to obtain permission from Caracol to make derivative works based upon the jointly-owned original Series. Nowhere does the Agreement state that Telemundo owns the original Series and nothing in the Agreement evidences a clear and unequivocal intention on the part of Caracol to part with its ownership share of the original Series. In order for Telemundo to achieve the status of sole owner of the Sequel, it was not necessary that Caracol give up its copyright in the Series.

Section 8 of the Term Sheet states: "All and any rights not granted expressly herein to Caracol shall be expressly reserved by TTS." The rights granted to Caracol in the Letter Agreement were the defined exhibition rights and the promised profit participation. There was no need to "grant" to Caracol the rights it held in the original Series – Caracol's joint ownership of the original Series were already owned by it by virtue of the parties' earlier agreements.

For any of these reasons, the Letter Agreement and Term Sheet cannot stand as an expression of transfer of Caracol's share of ownership interest in the original Series. Most important, however, is the lack of a clear expression of an intent to transfer Caracol's share of the copyright in the original Series. Consequently, the Letter Agreement fails to satisfy the requirements of 17 U.S.C. § 204 and cannot operate as a transfer or assignment of Caracol's interest in the copyright of the original Series. There is no genuine issue of material fact that the License Agreement contains no clear and unequivocal statement of Caracol's intent to part with its copyright ownership. Accordingly, summary judgment is required.

8.    <u>Consideration of parol evidence is inappropriate</u>

Under Florida's parol evidence rule, "evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." *Johnson Enters. of Jacksonville v. FPL Group,* 162 F.3d 1290, 1309 (11th Cir.1998). This is because representations made before or during the signing of a contract "are presumed to have merged in the written agreement." *Schubot v. McDonald's Corp.*, 757 F.Supp. 1351, 1357 (S.D.Fla.1990), *aff'd*, 963 F.2d 385 (11th Cir.1992). Under the parol evidence rule, "neither party may allege or prove

that by parol agreement such terms and conditions were other than those expressed in the contract." *Gulf Theatres v. Guardian Life Ins. Co. of Am.,* 157 Fla. 428 (Fla.1946).

"Whenever a party presents an arguable claim that a document contains a latent ambiguity, the court is obliged to consider the extrinsic evidence, at least to the extent necessary to determine whether the claimed latent ambiguity actually exists." *Bd. of Trs. of Internal Improvement Trust Fund v. Lost Tree Vill. Corp.*, 805 So.2d 22, 26 (Fla. 4th DCA 2001). A latent ambiguity is present when extraneous circumstances indicate "an insufficiency in the contract not apparent from the face of the agreement." *Hunt v. First Nat'l Bank,* 381 So.2d 1194, 1197 (Fla. 2d DCA 1980).

Here, however, under 17 U.S.C. § 204(a), a latent ambiguity regarding an intent to assign all of Caracol's interest would preclude a transfer, and parol evidence is ineffective to supply the required clear statement of intent. Nevertheless, extrinsic evidence overwhelmingly supports Caracol's position that no assignment of its rights was intended.

9.    <u>Caracol had no intent to assign its rights</u>

Despite the fact that parol evidence cannot resurrect a deficient writing or support an assignment when one is not clearly stated in a written document, deposition testimony obtained from Caracol during discovery establishes that Caracol had no intention to transfer its share of the copyright in the original season of El Señor de los Cielos to Telemundo.

Jorge Martinez, Caracol's legal representative, was questioned in deposition by counsel for Telemundo, Mr. Herbert, on October 10 and 11, 2019. Mr. Martinez was asked about his signing of the Letter Agreement, and testified:

Q. … You would not have signed that if you thought that, would you?

A. I signed the document convinced of what I have stated today, that it was only modifying the specific of Season -- specifically only Season Number 2. It was not touching at all the coproduction agreement. There were specific rules for the sequel.

Martinez Tr. 166:5-11

Q. Well, let me ask you this: Felipe Boshell was involved in negotiating the letter agreement. So did -- did he make a mistake in interpreting the -- those two terms? Did he ever tell you that?

A. I don't think so.

Q.· Okay.

A. Felipe Boshell was clear from the beginning that what was being negotiated were the rules for the second season, and the coproduction agreement was not being touched upon. That letter agreement, I repeat, is not a modification of the coproduction agreement. It's  developing of the paragraph that provides those – about this

case, where coproduction should be done, and one of the parties does not want to participate in the coproduction.

Q. Let me ask you a different question.

A. He had no doubts about it.

Martinez Tr. 162:15-25, 163:1-7

Additionally, in his deposition, Felipe Boshell testified in response to questioning by Caracol's counsel:

Q. … Now, in your negotiations leading up to the license agreement, was there ever any discussion about Caracol giving up all of its ownership rights in the original series of El Señor?

MR. HERBERT: Object to the form.

A. No. Never.

…

Q. Did you or anyone at Caracol interpret the license agreement as it was signed as a full transfer of all of its rights in the original season, the original series of El Señor?

MR. HERBERT: Object.

A. No. Never.

Boshell Tr. 208:24-25, 209:1-4, 6-11

More direct to the point, the declaration of Jorge Martinez filed with this motion makes it clear that Caracol never intended to transfer its ownership interest in the original Series. Mr. Martinez states:

As the Legal Representative of Caracol Television S.A., I signed the Letter Agreement on behalf of Caracol. As the signing authority for Caracol, I understood that the Letter Agreement permitted Telemundo to author a sequel based upon the original Series, to use elements of the original series in the production of the Sequel, to produce the Sequel at its own expense, to own the Sequel, and to exploit the Sequel for its own benefit. It was not the intent of Caracol, however, that the Letter Agreement would have any effect on the joint ownership of the original Series of El Señor de los Cielos. I am informed that Telemundo has asserted that the Letter Agreement transferred all Caracol's rights in the original Series to Telemundo; I can state with absolute certainty that that was not the intent of Caracol.

Martinez III, ¶ 20.

Approximately one year after the Letter Agreement was signed, Caracol learned that Telemundo had granted to its parent NBC Universal a license to produce a remake of *El Señor de los Cielos*. On August 13, 2014, Felipe Boshell, acting as a production manager at Caracol, sent a letter to Melanie Montenegro, at that time Vice President, Business & Legal Affairs at Telemundo,

requesting information regarding Caracol's right to receive 50% of net revenues from the licensing of the format. In a response from Ms. Montenegro the following day, she asserted that "the format and script rights of the Series, among other elements of the Series reverted back to Telemundo." This was the first time Caracol became aware that Telemundo asserted exclusive rights to the first season of the Series. Martinez II, ¶¶ 3, 4. Ms. Montenegro's revelation was a surprise to Caracol, because it had never intended to assign all of its rights in the original Series, and had no reason to believe that it had ceded those rights when it signed the Letter Agreement.

In response to Caracol's first motion for summary judgment, Telemundo offered the declaration of Melanie Montenegro, its in-house attorney who negotiated the terms of the agreement with Mr. Boshell and prepared the Letter Agreement for signature [DE 64]. Ms. Montenegro asserted that the parties had specifically negotiated the transfer of all of Caracol's rights in *El Señor de los Cielos*. To support her claims, Ms. Montenegro refers to her June 18, 2013, email to Mr. Boshell [DE 64-2, 64-3], in which she introduces herself and offers Caracol free exhibition rights in Colombia to the "second part of the production of 'El Señor de los Cielos' … in exchange for the rights stipulated in the case of producing a second part and subsequent sequels of our 'co-production.'" This preliminary offer, however, has no effect upon the resulting, signed agreement. First, Ms. Montenegro's unilateral statement of Telemundo's intent cannot stand as an indication of Caracol's intent. Second, "[t]he rule is that negotiations before the execution of a contract are absorbed in it." *Jacksonville Paper Co. v. Smith & Winchester Mfg. Co*., 147 Fla. 311, 315–16, 2 So. 2d 890, 892 (1941) (citing *Ross v. Savage et al*., 66 Fla. 106, 63 So. 148 (1913).

Ms. Montenegro's declaration also asserts that during her negotiations with Mr. Boshell leading up to the Letter Agreement, they discussed the transfer of all Caracol's rights in the original Series and that Mr. Boshell acknowledged that this was the case. The transfer of one's copyright requires the intention of the owner to do so, and Ms. Montenegro's sworn assertions do not change the fact that the Letter Agreement does not contain a clear and unambiguous intent on the part of Caracol to affect this transfer. Further, as stated above, Mr. Boshell has directly contradicted Ms. Montenegro's version of the negotiations, and Mr. Martinez has provided sworn testimony and his declaration that Caracol never intended to assign its rights in the original Series. Ms. Montenegro's assertions about pre-contract negotiations cannot replace the verified intent of Caracol.

Ms. Montenegro's parol evidence regarding the intentions of Caracol is thus immaterial. As stated above in this motion, if the Letter Agreement is ambiguous, if it is unclear whether a transfer was intended or not, then it cannot be a transfer of copyright.

Finally, because Ms. Montenegro drafted the agreement, any ambiguity must be weighed against the drafter. *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000). Ms. Montenegro had every opportunity to prepare language clearly and unambiguously stating that Caracol was assigning all of its rights in the original Series, if that was truly the intention of both parties, but she did not.

As established above, the Letter Agreement does not satisfy the requirement of 17 U.S.C. § 204 that an instrument of conveyance be clear and unequivocal. As there is no clear statement of transfer, the Letter Agreement cannot stand as a transfer of Caracol's copyright. But even if parol evidence is considered, it supports the clear lack of intent on the part of Caracol to cede its copyright. As a result, there is no genuine issue of material fact, and Caracol is entitled to summary judgment.

10.   Telemundo bargained for and received only the right to make one sequel

Pursuant to the procedures the parties included in their Co-Production Agreement, the Letter Agreement provided the terms under which Telemundo was "granted the sole right to produce the Derived Series." As the parties had agreed, the terms had to "include at a minimum: (a) a license fee equal to fifty-percent (50%) of the market rate value of the re-make, spin-off and/or sequel rights; and (b) a right of first refusal to obtain the exhibition rights to the Derived Series …"

In his deposition testimony, Felipe Boshell described the manner in which those minimum terms were met.

Q. Okay. Let me ask you, this -- this 50 percent of the market rate value of the remake, spin-off, or sequel rights, I want to ask you about how is that market rate value --

A. Yes.

Q. -- supposed to be calculated?

A. It's common in our industry that the license of a format, which is this -- this case is what we're talking about, the license of the format, you pay a percentage of the total cost of production as a format fee. So what this is referring to is that in case of a sequel we should assume there's a license fee and the other party should get their

50 percent. So if I got -- if Caracol were the one who were doing the production and not Telemundo – they don't want to do the co-production, sorry, then Caracol would have to pay 50 percent of the license to Telemundo and the other way around, and that is usually in terms for unscripted, it's usually between 5 to 8 percent of the production budget. In sequels -- and that's why we wrote it that way -- it should be that -- that way. If you're buying a format of a scripted, then you pay for the scripts which are already written if you're going to do a remake. For a sequel that's the way we decided would be more accurate or more market -- market sense -- it would make more sense as a market base.

Q. Okay. So you said that the license fee that they were talking about is usually between 5 to 8 percent of the total production costs?

A. Yes.

Q. All right. So then just using the example of Season 1 of El Señor, in that case the production calls for about 12 million?

A. Yes.

Q. So 10 percent would be 1.2 million, 5 percent would be 600,000, roughly?

A. Uh-huh.

Q. So somewhere between let's say 600 to 800,000, something like that --

A. Would be the 100 percent of that format fee.

Q. Okay.

A. So if one or the other didn't want to go as co-producers, the one who produced the show would pay 50 percent of that license for the rights.

Q. Okay. Now, what I want to ask you is in this case Telemundo produced Season 2 --

A. Yes.

Q. -- by itself, and Caracol never made any demand for this market value license fee, correct?

A. Because we agreed as you go -- as you do A and B, because we agreed that we weren't paying for the second season in Colombia against -- not receiving the – the payment for the license fee. So it's like a wash. That's why. That's what we agreed upon in many conversations; instead of you, you being Telemundo, paying me 50 percent of the license fee for my format, for licensing part of my format so you can produce the show with my license, and I don't have to pay you for your end product, for airing your end product in Colombia, then we just crossed those two out.

Boshell Tr. 117:12-15, 118:1-25, 119:1-20.

Thus, Caracol received, in exchange for granting to Telemundo the right to make a sole production of the Sequel, a value equivalent to one-half of the market license fee, as contemplated in the Co-Production Agreement. As Mr. Boshell testified, for the Sequel, that value was received in the form of free Colombian exhibition. By Mr. Boshell's account, this consideration was intended solely for Caracol's permission for Telemundo to produce a sequel and not for the assignment of any other rights.

11.   <u>The consideration received by Caracol was wholly inadequate to support a transfer of all of its rights.</u>

Caracol had invested approximately six million dollars in the production of the original Series, and received in return a one-half undivided ownership in the production and joint ownership with Telemundo of the copyright in the original Series. Martinez III, ¶ 8. At the time that the Letter Agreement was negotiated and signed, Caracol had not yet exhibited the original Series in Colombia, and had received no return on its investment. Martinez III, ¶ 9.

In the Letter Agreement, as consideration for Caracol granting permission to Telemundo to produce the Sequel, Caracol received the right to exhibit the Sequel in Colombia and a promised 15% share of net foreign sales from the distribution of the Sequel in territories other than the U.S. and Colombia. At the time the Letter Agreement was negotiated and signed, a separate contract between Caracol and Telemundo, called a Volume Deal, was in place that extended to Caracol a first option to acquire Colombian exhibition rights to Telemundo programs at the rate of $3,622.50 per episode during non-prime time hours. Thus, at the time of the Letter Agreement, which contemplated a 60-episode program, the value to Caracol of the free exhibition of the Sequel in Colombia was $217,350. Martinez III, ¶ 15.

Caracol began the Colombian exhibition of the Sequel, that is, the second season of *El Señor de los Cielos* in 2015. By that time, Caracol and Telemundo had entered into a new Volume Deal that priced the Colombian exhibition rights at $4,194 per episode during non-prime time. The completed Season 2 consisted of 84 episodes, and under the then-effective volume deal, the Colombian exhibition license fee would have been $352,296. Martinez III, ¶¶ 16,17.

Telemundo never paid the profit participation promised in the Letter Agreement, asserting without basis that its production budget had to be recouped from foreign net sales as a condition

17

of profit participation.[7] Thus, the value of the consideration received by Caracol under the Letter Agreement was $352,296.

The fact that Caracol did not intend to transfer its copyright is bolstered by the sheer inadequacy of the consideration provided in the Letter Agreement -- the value received under the terms of the Letter Agreement amounted to less than 6% of Caracol's investment. Martinez III, ¶ 21. Further, if such a bargain-basement transfer had been intended, the approval of the board of directors would have been needed. Martinez III, ¶ 22. As Caracol's legal representative, Mr. Martinez did not seek Board approval because he knew that such a transfer was not intended. Martinez III, ¶ 22.

Conclusion

The pleadings, admissions, and declarations on file show that there is no genuine issue of material fact and that the plaintiff is entitled to a judgment against the defendants as a matter of law. The parties' Letter Agreement, claimed by Telemundo to embody an assignment of Caracol's copyright in the original series of *El Señor de los Cielos*, does not satisfy the requirement imposed by Section 204(a) of the Copyright Act because it does not state a clear and unequivocal intent to transfer Caracol's ownership rights. In fact, the terms of the Letter Agreement providing Caracol's permission to Telemundo to make a sole production of a sequel contradict an outright transfer of Caracol's prior rights. While consideration of parol evidence as to the parties' intent regarding a transfer of copyright is inappropriate, if such evidence is considered it establishes that Caracol had no intent to transfer its ownership rights, rather it was providing Telemundo with a license to produce and own a sequel, and that the consideration provided to Caracol under the terms of the Letter Agreement, while sufficient for the grant of permission to Telemundo to make a sole production of the Sequel, is wholly inadequate to support a transfer of all of Caracol's valuable rights in the original joint work.

---

[7] The License Agreement provides, "TTS shall pay Caracol a foreign participation equal to 15% of 100% of Foreign Net Sales ( as defined below) after recoupment of the Production Budget." The terms of the Agreement do not limit recoupment to any particular source.

Accordingly, this Court should enter summary judgment in favor of plaintiff Caracol on Count I of the Amended Complaint and declare that Caracol remains the owner of a one-half share of the copyright in the original Series, the first season of *El Señor de los Cielos*.

<u>Request for Hearing</u>

Pursuant to Local Rule 7.1(b)(2), Caracol requests a hearing for oral argument on this motion. Caracol desires a hearing in order that both sides have an opportunity to present further explanations and to clarify the arguments made on the papers as to this significant motion. A hearing will also enable counsel for the parties to answer questions the Court may have about their positions.

DATED this 15th day of August, 2020.

Respectfully submitted,

*/s/David M. Rogero/*
**David M. Rogero**
Fla. Bar No. 212172
E-mail: dmrogero@dmrpa.com
David M. Rogero, P.A.
2625 Ponce de Leon Blvd, Suite 280
Coral Gables, FL 33134
Telephone: (305) 441-0200
Fax: (305) 460-4099
*Attorney for Plaintiff Caracol Television S.A.*

## CERTIFICATE OF SERVICE

I certify that on August 15, 2020, I served the foregoing Plaintiff's Renewed Motion for Summary Judgment as to Count I of the Amended Complaint, together with the following:

- Plaintiff's Statement of Material Facts Supporting Plaintiff's Renewed Motion for Summary Judgment as to Count I of the Amended Complaint

- Declaration of Jorge Martinez de Leon in Support of Plaintiff's Renewed Motion for Summary Judgment as to Count I of the Amended Complaint

- Excerpts from the Deposition Transcript of Jorge Martinez

- Excerpts from the Deposition Transcript of Felipe Boshell

upon the following persons through the Court's CM/ECF facility:

Gregory W. Herbert, Esq.
Joshua Brown, Esq.
Greenberg Traurig, P.A.
450 S. Orange Avenue, Suite 650
Orlando, FL 32801
herbertg@gtlaw.com; brownjr@gtlaw.com
*Attorneys for Defendants*

/s/David M. Rogero/